**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____ :
                                        :
KPH Healthcare Services, Inc.,          :
a/k/a Kinney Drugs, Inc., et al.,       :       No. 1:20-cv-08754
                                        :
          v.                            :
                                        :
Abbvie Inc., et al.                     :
_____ :
                                        :
KPH Healthcare Services, Inc.,          :
a/k/a Kinney Drugs, Inc., et al.,       :       No. 1:20-cv-08756
                                        :
          v.                            :
                                        :
Hetero USA Inc., et al.                 :
                                        :
_____ :

**DECLARATION OF DIANNE M. NAST IN SUPPORT OF
PLAINTIFF KPH'S MOTION FOR APPOINTMENT OF
<u>INTERIM CO-LEAD COUNSEL FOR THE DIRECT PURCHASER CLASS</u>**

I, Dianne M. Nast, am one of counsel for Plaintiff KPH Healthcare Services, Inc., a/k/a

Kinney Drugs, Inc. ("KPH") in this litigation. I submit this declaration in support of KPH's

Motion for the appointment of Interim Co-Lead Counsel, submitted contemporaneously

herewith. I declare that the forgoing is true and correct:

1.  Annexed as Exhibit 1 is my biography;

2.  Annexed as Exhibit 2 is the resume of Michael L. Roberts;

3.  Annexed as Exhibit 3 is Opinion and Order, _City of Providence Rhode Island, et al. v.
    Abbvie Inc., et al._, Civil Action No. 20-cv-7492 (S.D.N.Y. Oct. 13, 2020) (Liman, J.);

4.  Annexed as Exhibit 4 is a Sample Order suggesting Time and Expense Guidelines
    that could apply to this matter;

5.   Annexed as Exhibit 5 is a sample Protective Order based on the model Protective

Order of the United States District Court for the Southern District of New York

(Liman, J.);

6.   Annexed as Exhibit 6 is a sample Order Regarding Production of Documents and

Electronically Stored Information;

7.   Annexed as Exhibit 7 is Order Re Consolidation and Interim Class Counsel (Doc. 59)

in *In re Robinhood Outage Litig.*, Master File No. 20-cv-01626-JD (N.D. Cal. July

14, 2020) (Donato, J.);

8.   Annexed as Exhibit 8 is Order Re Interim Counsel and Briefing Schedule (Doc. 65)

in *In re Robinhood Outage Litig.*, Master File No. 20-cv-01626-JD (N.D. Cal. July

22, 2020) (Donato, J.); and

9.   Annexed as Exhibit 9 is Pretrial Order # 20, Order Establishing the Plaintiffs'

Leadership Structure, Appointing Leadership Members and Designating Leadership

Duties and Responsibilities (Doc. 685) in *In re Zantac (Ranitidine) Products Liability

Litigation*, MDL No. 2924 (S.D. Fla. May 8, 2020) (Rosenberg, J.).

Dated:  October 20, 2020

Respectfully Submitted:

_____

Dianne M. Nast

# EXHIBIT 1



## BIOGRAPHY OF DIANNE M. NAST

Dianne M. Nast is a *magna cum laude* graduate of Rutgers Law School. She is the founder and senior member of NastLaw LLC in Philadelphia. For almost 20 years before that, she was a senior shareholder with the Philadelphia law firm of Kohn, Nast & Graf, P.C. (now Kohn, Swift & Graf, P.C.), and then a senior shareholder at RodaNast, P.C. from 1995 to 2012.

Ms. Nast, an active member of the bar for over four decades, has extensive experience in complex litigation. She has a reputation for working cooperatively and collegially with co-counsel and facilitating resolution of disagreement.

NastLaw LLC is a nationally recognized law firm with a long track record of success in complex litigation, including particularly antitrust cases. Ms. Nast also has extensive experience in tort and consumer litigation.

Ms. Nast holds an AV Martindale-Hubbell rating. Since 2003, she has been listed in each edition of *The Best Lawyers in America* (currently in the categories of Antitrust Law, Mass Tort Litigation, Class Actions, and Personal Injury). The *National Law Journal* selected Ms. Nast as one of the nation's top fifty women litigators.

Ms. Nast has been repeatedly selected by *Philadelphia Magazine* as one of Philadelphia's Best Complex Litigation Lawyers. She has been named as one of Pennsylvania's Top Fifty Women Lawyers and has been named a Super Lawyer every year since 2002. She appears in numerous *Who's Who* publications and

recently received the Who's Who Lifetime Achievement Award (2020-2021). Additionally, Ms. Nast is listed in *Chambers USA* and Best Lawyers in America.

In April 2015, the American Bar Association's Tort, Trial and Insurance Practice Section awarded Ms. Nast its Pursuit of Justice Award.  In June 2016, Ms. Nast was selected by *The Legal Intelligencer*, Pennsylvania's leading legal newspaper, to receive its Lifetime Achievement Award.  In 2017, *The Legal Intelligencer* named Ms. Nast as a recipient of its Professional Excellence Award.

Ms. Nast served as a Director of the Federal Judicial Center Foundation for eleven years.  In 1998, then Chief Justice William H. Rehnquist named Ms. Nast Chair of the Board of Directors of the Foundation.

Judge Edward Becker, then Chief Judge of the United States Court of Appeals for the Third Circuit, appointed Ms. Nast to serve as a member of the fifteen-member Third Circuit Task Force on Selection of Class Counsel.  The Task Force issued a report, *Selection of Class Counsel*, 208 F.R.D. 340 (2002), which has been cited over 100 times in court opinions, legal briefs, and legal treatises.  Ms. Nast was also selected by The American Law Institute to serve on ALI's Principles of the Law of Aggregate Litigation Project.

Ms. Nast chaired the Lawyers Advisory Committee of the United States Court of Appeals for the Third Circuit.  She served for eight years on the Third Circuit's Committee on Revision of Judicial Conduct Rules of the Judicial Council and on the Judicial Conference Long Range Planning Committee.  Ms. Nast has served as Lawyer Chair of the Judicial Conference of the United States Court of Appeals for the Third Circuit.  She is a member of the Historical Society of the Third Circuit, and chaired the Circuit's Centennial Celebration.

Ms. Nast was appointed by the late Chief Judge Alfred L. Luongo to Chair the Eastern District of Pennsylvania's Lawyers Advisory Committee, and served for four years in that position.  She served for three years as President of The Historical Society for the United States District Court for the Eastern District of Pennsylvania, and as Editor of the Society's Annual Historical Calendar.

Ms. Nast is a current member of the Disciplinary Committee of the Supreme Court of Pennsylvania.  She is a Fellow of the American Bar Foundation.  Ms. Nast is an elected member of the American Law Institute, has served as a member of Board of Advisors of the Sedona Conference, and a member of the American Antitrust Institute and the Public Justice Foundation.

Ms. Nast is a member of the American Bar Association Litigation Section, where she has served on three separate Task Forces: the Task Force on State Justice Initiatives, the Task Force on the State of the Justice System, and the Task Force on Strategic Planning.  She served a three-year term on the Section's Council, served as a Section Division Director, and co-chaired the Section's Antitrust Committee.  She was a Delegate to the American Bar Association House of Delegates and the Pennsylvania Bar Association House of Delegates.

Ms. Nast also served as a member of the Philadelphia Bar Association Board of Governors and is a member of the Public Justice Foundation and the American Antitrust Law Institute where she serves on the Board of Directors.

Ms. Nast served six years as a Director on the Board of the Public Defender's Office of Philadelphia.  She was selected as one of a small group of Philadelphia attorneys to be appointed Judge Pro Tempore, serving as presiding Judge or Settlement Judge in several major civil jury cases in the Philadelphia Court of Common Pleas.

Ms. Nast has participated as a panelist on programs at the Judicial Conferences of the United States Courts of Appeals for the Third and Fourth Circuits.  She frequently serves as a faculty member or panelist on legal educational programs, including programs for the American Bar Association, the American Law Institute, the National College of Advocacy, the American Trial Lawyers Association, the University of Pennsylvania Carey Law School, Northwestern Pritzker University School of Law, Rutgers Law School, Penn State Dickinson Law, the Pennsylvania Bar Association, Philadelphia Bar Association, Allegheny County Bar Association, Massachusetts Bar Association, American Association for Justice, and Harris Martin Publishing.

Ms. Nast has been appointed as Lead Counsel or as a member of the Executive Committees in scores of Consumer, Antitrust and Products Liability cases.  Most recently she has been appointed by The Honorable Cynthia Rufe to be Liaison and Co-Lead Counsel for Direct Purchaser Plaintiffs in the *Generic Pharmaceuticals Pricing Litigation*, MDL 2724 (E.D. Pa.), currently one of the largest antitrust MDLs in the United States.

Other cases where Ms. Nast has been appointed as Lead Counsel or Co-Lead Counsel include the following representative cases:  *Beechnut Consumer Litigation*, Master File No. 86-6608 (E.D. Pa.); Augmentin Antitrust Litigation C.A. No. 04-CV-23 (E.D. Va.); *Chrysler Motors Corporation Overnight Evaluation Program Litigation*, MDL 740 (E.D. Mo.); *Chrysler II Litigation*, Master File No. 92-424-JPG (S.D. Ill.); *Hertz Car Rental Litigation*, Civil Action No. 88-0661 (E.D. Pa.); *SmithKline Beecham Securities Litigation*, (Phil. C.C.P. No. 2562); *Nifedipine Antitrust Litigation*, MDL No. 1515 (D.D.C.); *Paxil Antitrust Litigation (Nichols, et al. v. SmithKline Beecham Corp.),* Civil Action No. 00-6222 (E.D. Pa.); *Wellbutrin SR Antitrust Litigation,* (*SAJ Distributors, Inc., et al v. SmithKline Beecham Corp.*, Civil Action No. 04-5525 (E.D. Pa.)); *Steel Drums Antitrust Litigation*, MDL No. 887 (S.D. Ohio); *Steel Pails Antitrust Litigation*, Master File No. C-1-92-213 (S.D. Ohio);

4

*Waste Haulers Antitrust Litigation*, Master File No. 87-3717 (E.D. Pa.); *Comcast Corp. Set-Top Cable Television Box Antitrust Litigation*, MDL No. 2034 (E.D. Pa.); *Yaz/Yasmin/Ocella/Gianvi Products Liability Litigation*, No. 1307 (Phila. C.C.P. No. 1307); and *Zoloft (Sertraline Hydrochloride) Products Liability Litigation,* MDL No. 2342 (E.D. Pa.).

Also, Ms. Nast has been appointed as an Executive Committee member in *Castano Tobacco Litigation*, Civil Action No. 94-1044 (E.D. La.) and *General Motors LLC Ignition Switch Litigation*, MDL No. 2543 (S.D.N.Y.).

Ms. Nast was appointed as a member of the Plaintiffs' Steering Committee in the following representative cases: *Ovcon Antitrust Litigation (SAJ Distributors, Inc., et al. v. Warner Chilcott Holdings Company III, Ltd., et al.*, Civil Action No. 1:05-CV-02459 (D.D.C.)); *Airlines Transportation Antitrust Litigation*, MDL No. 869 (N.D. Ga.); *Carbon Dioxide Antitrust Litigation*, MDL No. 940 (M.D. Fla.); *Catfish Antitrust Litigation*, MDL No. 928 (N.D. Miss.); *Chlorine and Caustic Soda Antitrust Litigation*, Master File No. 86-5428 (E.D. Pa.); *Corn Derivatives Antitrust Litigation,* MDL No. 414 (D.N.J.); *Glassine & Greaseproof Paper Antitrust Litigation*, No. 80-891 (E.D. Pa.); *Castano Tobacco Litigation*, Civil Action No. 94-1044 (E.D. La.); *NFL Players' Concussion Injury Litigation,* MDL No. 2323 (E.D. Pa.);*Text Messaging Antitrust Litigation*, MDL No. 1997 (N.D. Ill.); *Silicone Breast Implant Litigation*, MDL No. 926 (N.D. Ala.); *Silicone Breast Implant, Louisiana Litigation*,; *Serzone Products Liability Litigation*, MDL No. 1477 (S.D. Va.); *Testosterone Replacement Therapy Products Liability Litigation*, MDL No. 2545 (N.D. Ill.); *Transvaginal Mesh Products Liability Litigation*, MDL Nos. 2187, 2325, 2326, 2327 and 2387 (S.D.W.V.); and *Xarelto Products Liability Litigation*, MDL No. 2592 (E.D. La.).

Also, she was appointed as Sub-Class Counsel and Settlement Counsel in *NFL Players' Concussion Injury Litigation,* MDL No. 2323 (E.D. Pa.); and Plaintiffs' Mediation Counsel in *Skelaxin Antitrust Litigation,* MDL No. 2343 (E.D. Tenn.).

Additionally, Ms. Nast served as the Chairperson or as a member of the Fee Committee in the following cases: *Avandia Marketing, Sales Practices and Products Liability Litigation*, MDL No. 1871 (E.D. Pa.); *Diet Drug Product Liability Litigation*, MDL No. 1203 (E.D. Pa.); *Factor Concentrate Litigation*, MDL No. 986 (N.D. Ill.); *Medtronic, Inc. Products Liability Litigation I*, MDL No. 1726 (D. Minn.); *Medtronic, Inc. Sprint Fidelis Leads Products Liability Litigation II*, MDL No. 1905 (D. Minn.) and *Comcast Corp. Set-Top Cable Television Box Antitrust Litigation*, MDL No. 2034 (E.D. Pa.).

Ms. Nast is active in community matters.  She was a co-founder and member of the Board of Directors for the Center for Research on Women and Newborn Health and served as President of the Foundation's Board for ten years. Additionally, for four years, Ms. Nast served on a local High School Board of Education and chaired a local elementary school board, Grades K – 12.

# EXHIBIT 2

ROBERTS LAW FIRM
ROBERTS GROUP

## Michael L. Roberts, Managing Partner

Michael L. Roberts has served as lead and co-lead counsel and on executive committees in multiple complex class actions, as described below. He has significant experience in antitrust law, class action practice, electronic discovery, case investigation, and settlement negotiation. Mr. Roberts has worked and continues to work tenaciously and efficiently towards the best outcome for his clients. As the owner and manager of the Roberts Law Firm, P.A, Mr. Roberts is licensed to practice law in Arkansas, Florida, Tennessee, Texas, New York, and Illinois.

### Appointments as Co-Lead Counsel

*First Impressions Salon, Inc., et al. v. National Milk Producers Federation*, United States District Court for the Southern District of Illinois Case No. 3:13-cv-00454- NJR-SCW (class action in which Michael Roberts serves as Co-Lead Counsel for Antitrust Direct Purchaser Plaintiffs; Court has granted preliminary approval of class settlement). Judge Nancy J. Rosenstengel; Magistrate Judge Stephen C. Williams.

*In re Parking Heaters Antitrust Litig*ation United States District Court for the Eastern District of New York, Case No. 15-mc-940-JG-JO (Michael Roberts was appointed Co-Lead Interim Counsel for Direct Purchaser Plaintiffs; case settled). Chief Judge Dora Lizette Irizarry; Magistrate Judge James Orenstein.

*Fond Du Lac Bumper Exchange v. Jui Li Enterprise Co. Ltd.* ("AM Sheet Metal Antitrust Litigation"), United States District Court for the Eastern District of Wisconsin, Case No. 2:11 CV 00162 - LA (Michael Roberts was appointed Co-Lead Counsel for Third Party Payor Plaintiffs; case settled). Judge Lynn Adelman.

*National Trucking Financial Reclamation Services, LLC vs. Pilot Corporation, Pilot Travel Centers d/b/a Pilot Flying J, et al,* United States District Court for the Eastern District of Arkansas, Case No. 4:13-cv-00250-JMM. (Michael Roberts was appointed Co-Lead Counsel; Michael Roberts was appointed settlement class counsel; case settled in eight months for $84 million plus injunctive relief). Judge James M. Moody.

*In re Microsoft Antitrust Litigation:   Paul Peek, D.D.S., et al. v. Microsoft Corporation,* Circuit Court of Pulaski County, Arkansas, Twelfth Division, No. CV06-2612 (Michael Roberts was appointed Co-Lead Settlement Class Counsel) (case settled for $37 million). Judge Alice Gray.

*In re Ori vs. Fifth Third Bank and Fiserv, Inc.,* United States District Court for the Eastern District of Wisconsin, Case No. 08-CV-00432-LA.  (Michael Roberts was appointed Co-Lead Settlement Class Counsel; case settled). Judge Lynn Adelman; Magistrate Judge Patricia J. Gorence.

*In re Generic Pharmaceuticals Antitrust Litigation*, United States District Court for the Eastern District of Pennsylvania, Case No. 2:16-md-02724-CMR, MDL No. 2724 (ongoing class action in which Michael Roberts serves on the Court-Appointed Direct Purchaser Plaintiffs' Steering Committee). Judge Cynthia M. Rufe.

ROBERTS LAW FIRM
ROBERTS GROUP

## Other Leadership Roles

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litigation,* United States District Court for the Eastern District of New York, Case No. 1:18-cv-02819-NG-LB (Michael Roberts was appointed to the Plaintiffs' Executive Committee for Direct Purchaser Plaintiffs). Judge Nina Gershon; Magistrate Judge Lois Bloom.

*In re Effexor XR Antitrust Litigation,* United States District Court for the District of New Jersey, Case No. 3:11-cv-05479-PGS-LHG (Michael Roberts was appointed Co- Chair Discovery Committee for Direct Purchaser Plaintiffs). Judge Peter G. Sheridan; Magistrate Judge Lois H. Goodman.

*In re Heartland Payment Systems Inc. Customer Data Security Breach Litigation*, United States District Court for the Southern District of Texas, Case No. H-09-MD-2046 (Michael Roberts was appointed as a member of the Steering Committee; case settled). Judge Lee H. Rosenthal.

*In re U.S. DRAM Antitrust Litigation,* United States District Court for the Northern District of California, Case No. 4:02-md-01486-PJH (settled for approximately $300 million), Judge Phyllis J. Hamilton; Magistrate Judge Joseph C. Spero; Michael Roberts represented indirect purchasers in the Arkansas class action, *Bruce K. Burton, M.D., P.A. Malvern Diagnostic Clinic, et al. v. Micron Technology, Inc., et al.* Circuit Court of Hot Spring County, Arkansas, First Division, Case No. CV-2004-226-1, Circuit Judge Lynn Williams.

# EXHIBIT 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/13/2020
```

------------------------------------------------------------------X

CITY OF PROVIDENCE, RHODE ISLAND, et al.,

       Plaintiffs,

    -v-

ABBVIE INC., et. al.,

      Defendants.

------------------------------------------------------------------

| |
|---|
| 20-cv-5538 (LJL) |
| 20-cv-7352 (LJL) |
| 20-cv-5735 (LJL) |
| 20-cv-7110 (LJL) |
| 20-cv-5837 (LJL) |
| 20-cv-5813 (LJL) |
| 20-cv-7492 (LJL) |
| 20-cv-5826 (LJL) |
| 20-cv-7309 (LJL) |
| 20-cv-5735 (LJL) |
| 20-cv-5813 (LJL) |
| 20-cv-5901 (LJL) |
| 20-cv-5826 (LJL) |
| 20-cv-6769 (LJL) |
| 20-cv-7177 (LJL) |
| 20-cv-6647 (LJL) |
| 20-cv-7296 (LJL) |
| 20-cv-7304 (LJL) |

<u>OPINION & ORDER</u>

LEWIS J. LIMAN, United States District Judge:

Before the Court are applications from various plaintiffs' counsel seeking appointment as Interim

Lead Counsel/Interim Co-Lead Counsel to represent the interests of the proposed End-Payor

class, and a single application for appointment as Interim Lead Counsel to represent the interest

of the proposed Direct Purchaser class, pursuant to Federal Rule of Civil Procedure 23(g).

  The Court appoints Sharon K. Robertson of Cohen Milstein Sellers & Toll LLC ("Cohen

Milstein") and Robin van der Muelen of Labaton Sucharow LLC ("Labaton Sucharow")

(together the "Cohen Milstein Group") as Interim Co-Lead Class Counsel.  The Court denies the

motion to appoint Interim Co-Lead Class Counsel in the Direct Purchaser actions.

## I.    Background

The applications before the Court arise from a set of related lawsuits pending before the Court relating to allegations that Defendants engaged in an illegal scheme to delay competition in the United States and its territories from generic versions of Bystolic®, a prescription medication containing the active pharmaceutical ingredient nebivolol hydrochloride[1] and approved by the U.S. Food and Drug Administration ("FDA") for the treatment of hypertension.

There are two sets of lawsuits before the Court.  The first set of lawsuits comprises two actions brought by a single Corporation, J M Smith Corporation, filed on July 23, 2020 and September 1, 2020 respectively, which was a direct purchaser of Bystolic and generic equivalents bringing federal antitrust claims on behalf of a putative class of persons or entities who purchased Bystolic directly from any drug manufacturer.[2]  The second set of actions, filed shortly thereafter, is brought by indirect purchasers of Bystolic, which include consumers, health insurers, and welfare plans ("End-Payors").[3]  Beginning on July 17, 2020, and continuing until September 12, 2020, 13 different End-Payor lawsuits were filed in this court, each on behalf of one or multiple corporate entities or individuals seeking to represent a class of persons and

---

[1] The Complaints uses "nebivolol" and "nebivolol hydrochloride" interchangeably.

[2] *J M Smith Corp. v. Forest Laboratories Inc.*, No. 20-cv-5735 (S.D.N.Y. 2020); *J M Smith Corp. v. Watson Pharma, Inc.*, 20-cv-7110 (S.D.N.Y. 2020) (together, "Direct Purchaser Actions").

[3] *City of Providence, Rhode Island. v. AbbVie Inc.*, No. 20-cv-5538 (S.D.N.Y. 2020); *UFCW Local 1500 Welfare Fund v. AbbVie Inc.*, No. 20-cv-5837 (S.D.N.Y. 2020); *Teamsters Local 237 Welfare Fund v. AbbVie Inc.*, 20-cv-5813 (S.D.N.Y. 2020); *Mayor and City Council of Baltimore v. AbbVie Inc.*, No. 20-cv-5826 (S.D.N.Y. 2020); *Law Enforcement Health Benefits, Inc. v. AbbVie Inc.*, 20-cv-5901 (S.D.N.Y. 2020); *Teamsters Western Region & Local 177 Health Care Plan v. AbbVie Inc.*, 20-cv-6647 (S.D.N.Y. 2020); *John Wilder v. AbbVie Inc.*, No. 20-cv-6769 (S.D.N.Y. 2020); *Katherine Chinnery v. AbbVie Inc.*, No. 20-cv-7177 (S.D.N.Y. 2020); *York Keels v. AbbVie Inc.*, No. 20-cv-7309 (S.D.N.Y. 2020); *Angela Maffei v. AbbVie Inc.*, No. 20-cv-7296 (S.D.N.Y. 2020); *Fraternal Order of Police, Miami Lodge 20 Ins. Trust Fund v. AbbVie Inc.*, 20-cv-7304 (S.D.N.Y. 2020); *Nina Cook v. AbbVie Inc.*, 20-cv-7352 (S.D.N.Y. 2020); *Richard Malek v. AbbVie Inc.*, 20-cv-7492 (S.D.N.Y. 2020) (together, "End-Payor Actions").

entities in the United States and its territories that purchased, paid and/or provided reimbursement for some of all of the purchase price of Bystolic, other than for resale, indirectly (i.e. did not purchase Bystolic directly from Defendants or their affiliates.).

Each of the lawsuits is based on substantially identical facts, although the claims differ between the Direct Purchaser Actions and the End-Payor Actions: the former bring claims seeking damages under federal antitrust law while the latter bring claims under state antitrust, consumer protection, and unjust enrichment laws for damages and under federal antitrust law for injunctive relief only. In both sets of cases, Plaintiffs seek to recover damages arising from Forest's alleged unlawful agreements with Hetero USA, Inc. and Hetero Labs Ltd. ("Hetero"); Torrent Pharmaceuticals Ltd. and Torrent Pharma, Inc. ("Torrent"); Alkem Laboratories Ltd. ("Alkem"); Indchemie Health Specialties Private Ltd. ("Indchemie"); Glenmark Generics Inc., USA, Glenmark Generics Ltd., and Glenmark Pharmaceuticals S.A. ("Glenmark"); Amerigen Pharmaceuticals, Inc. and Amerigen Pharmaceuticals, Ltd. ("Amerigen"); and Watson Pharma, Inc. and Watson Pharmaceuticals, Inc. ("Watson") (collectively the "Settling Generics") not to compete in the market for Bystolic in the United States and its territories. *See City of Providence v. AbbVie Inc* No. 20-cv-5538, Dkt. No. 1 (S.D.N.Y. July 17, 2020).[4]

Bystolic is a beta blocker. It blocks the effects of the hormone epinephrine, thereby causing the heart to beat more slowly and with less force, which in turn lowers blood pressure. *Id*. ¶ 1.

In December 2011—as soon as it was possible to do so—seven drug companies filed applications for FDA approval of generic versions of Bystolic. *Id*. ¶ 2. In March 2012,

---

[4] Because the allegations in the End-Payor actions are substantially identical, the Court draws the below allegations from the first-filed case.

Forest sued them for infringement of U.S. Patent No. 6,545,040 (the "'040 patent").  *Id*. ¶ 5.

Each generic company contended that its generic would not infringe the asserted patent claims or

the claims were invalid.

The complaints allege that the generic companies' position in the patent litigation was

very strong.  *Id*. ¶ 7.  An earlier patent had disclosed a nebivolol compound with a mixture of

stereoisomers—different three-dimensional shapes of an organic compound—so the '040 patent

could not claim a nebivolol compound with the same mixture, or else it would be invalid for

anticipation.  *Id*. ¶¶ 104-105.  But the generic companies' drug products contained the disclosed

mixture of stereoisomers.  Thus, the argument is, either their products did not infringe the '040

patent, or the '040 patent was invalid.

Nonetheless, between October 2012 and November 2013, Forest entered into

settlement agreements with each of the Settling Generics, each of which required the Settling

Generics to defer the launch of their generic Bystolic products until September 2021only three

months before the expiration of the '040 patent.  *Id*. ¶¶ 125-145.

In 2019, the reason that Forest was able to forestall competition for so long was

revealed: these settlement agreements included large, unjustified payments to the Settling

Generics in exchange for the Settling Generics' agreements not to compete in the market for

Bystolic.  According to documents in connection with Forest's Merger Agreement with Actavis,

which became public in March 2019 in the course of a different lawsuit involving Forrest, *see Id*.

¶ 126, Forest's settlement agreements required Forest to pay *at least* $15 million to each generic

company after February 2014—to say nothing of what Forest may have already paid the Settling

Generics—and included side deals and reimbursement of the Settling Generics' litigation costs.

*Id*.

Four of the Settling Generics obtained approval of their generic Bystolic products in 2015, and two obtained approval thereafter. In June 2015, the last patent protecting Bystolic (other than the '040 patent) expired. *Id.* ¶ 7. It is asserted that the only reason that generic Bystolic did not enter the market in 2015 is Forest's unlawful pay-for-delay settlement with each Settling Generic. Due to these settlements, purchasers allege they must pay higher prices for brand Bystolic until September 17, 2021.

The Direct Purchaser Plaintiff brings actions on its own behalf on behalf of a class of direct purchasers which includes all persons or entities in the united states who purchased brand or generic Bystolic from any drug manufacturer in the relevant period. *J M Smith Corp. v. Forest Laboratories Inc.*, No. 20-cv-5735, Dkt. No. 1 ¶ 65. As noted above, the End-Payor Plaintiffs bring actions on their own behalf and on behalf of classes of all similarly situated End-Payors. End-Payors are the final link in the chain of distribution of pharmaceuticals; they include consumers and those who pay for any portion of the price the consumer does not pay for (*e.g.* insurers and health and welfare plans). Defendants' alleged unlawful conduct has prevented generic nebivolol hydrochloride manufacturers from entering the market with competing generic products and has allegedly cost Plaintiffs in both classes and the Classes substantial overcharge damages.

On September 9, 2020, the Court received leadership applications from the following law firms (and individual counsel therein) seeking appointment as interim class or co-Lead class counsel on behalf of a putative End-Payor class: Cohen Milstein, *see Mayor and City Council of Baltimore v. AbbVie Inc.*, No. 1:20-cv-5826, Dkt. No. 38; Labaton Sucharow, *see UFCW Local 1500 Welfare Fund v. AbbVie, Inc.*, No. 1:20-cv-5837, Dkt. No. 25; Motley Rice LLC, *see The City of Providence, Rhode Island v. AbbVie Inc.*, No. 20-cv-5538, Dkt. No. 27; Bernstein

Liebhard LLP, *see Wilder v. AbbVie Inc.*, No. 20-cv-6769, Dkt. No. 11; Grant & Eisenhofer P.A,
*see Law Enforcement Health Benefits, Inc. v. AbbVie Inc.*, No. 1:20-cv-5901, Dkt. No. 16.;
Girard Sharp LLP (with Glancy, Prongay & Murray LLP as liaison counsel), *see In re Bystolic*
*(Nebivolol Hydrochloride) Antitrust Litig.*, No. 1:20-cv-5538, Dkt. No. 25; and Berman Tabacco,
*see Teamsters Western Region & Local 177 Health Plan v. AbbVie, Inc.*, No. 1:20-cv-6647, Dkt.
No. 15.  The Court has also received the following four letters supporting two of the
aforementioned applications from the following counsel, each of whom represents a different
End-Payor Plaintiff: a letter from Spector, Roseman & Kodroff PC supporting the application of
the Cohen Milstein Group, *see Chinnery v. AbbVie Inc.*, No. 1:20-cv-7177, Dkt. No. 4; a letter
from Shepherd, Finkleman, Miller & Shah, LLP, also supporting the application of the Cohen
Milstein Group, *see Fraternal Order of Police, Miami Lodge 20 Ins. Trust Fund v. AbbVie Inc.*,
No. 1:20-cv-7304, Dkt. No. 7; a letter from Hach Rose Schirripa & Cheverie, LLP, also
supporting the application of the Cohen Milstein Group, *see Teamsters Local No. 1150*
*Prescription Drug Benefit Plan v. AbbVie, Inc.*, No. 20-cv-6223, Dkt. No. 11; and a joint letter
from The Joseph Savari Law Firm Inc., Edelson Lechtzin LLP, Grabar Law Office, Robbins
Geller Rudman & Dowd, LLP, and Meade Young LLC, supporting the application of Motley
Rice LLC and Bernstein Liebhard LLP, *see The City of Providence, Rhode Island v. AbbVie,*
*Inc.*, No. 1:20-cv-5538-LJL, Dkt. No. 29.

Also on September 9, 2020, the Court received an application from the law firm Gerstein
& Fisher LLP and Berger Montague PC seeking appointment as co-lead class counsel on behalf
of Direct Purchasers, as well as the appointment of an executive committee.  *J M Smith Corp. v.*
*Forest Laboratories LLC*, No. 20-cv-5735, Dkt. No. 45.

## II. Discussion

### A. Legal Standard

Under Federal Rule of Civil Procedure 23(g)(3) ("Rule 23(g)(3)"), the Court is authorized to "designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action." Fed. R. Civ. P. 23(g)(3); *see also* Fed. R. Civ. P. 23(g)(2)(A) committee note (discussing and allowing the designation of interim counsel prior to a decision on class certification). Such an order serves an important purpose in an appropriate case. Particularly when there are competing complaints, the appointment of interim counsel "clarifies responsibility for protecting the interests of the [putative] class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement." Manual for Complex Litigation (Fourth) § 21.11 (2004) ("MCL"). Judges in this District have noted that, "When appointing interim class counsel, courts generally look to the same factors used in determining the adequacy of class counsel under Rule 23(g)(1)(A)." *In re Mun. Derivatives Antitrust Litig.*, 252 F.R.D. 184, 186 (S.D.N.Y. 2008) (citing *In re Air Cargo Antitrust Litig.*, 240 F.R.D. 56, 57 (E.D.N.Y. 2006)); *see In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2011 WL 5980198, at *2 (S.D.N.Y. Nov. 29, 2011) ("The consideration set out in Rule 23(g)(1)(A), which govern the appointment of class counsel once a class is certified, are widely accepted to apply to the designation of interim class counsel before certification as well.").

Rule 23(g)(1)(A) sets forth four factors that the Court must consider in appointing a class counsel once a class has been certified:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law;

and (iv) the resources that counsel will commit to representing the class

Fed. R. Civ. P. 23(g)(1)(A). When multiple lawyers or firms submit applications to be made lead counsel and "more than one choice of counsel satisfies these requirements for adequacy, Rule 23(g)(2) provides that the court 'must appoint the applicant best able to represent the interests of' the plaintiffs." Opinion & Order Regarding Appointment of Interim Co-Lead Counsel, *In re Interest Rates Swaps Antitrust Litig.*, No. 16-MD-1704 (S.D.N.Y. Aug. 3, 2016) (citing *In re Mun. Derivatives Antitrust Litig.*, 252 F.R.D. at 186).

In addition to these compulsory factors, Rule 23(g)(1)(B) also provides that the Court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." This necessarily requires a judgment call by the Court, as most—if not all—applicants are highly qualified. Oftentimes, the decision may be influenced by factors such as whether there are clear guidelines for compensation and whether the designated counsel can fairly represent the various interests in the litigation, particularly when diverse interests exists within the class or parties. MCL § 10.224. It ultimately falls to the Court to make a judgment with respect to the foregoing factors as to which applicant for lead counsel is best equipped to lead and represent the putative class's interests. The lodestar, however, always remains the best interests of the class of plaintiffs. In essence, the Court is sitting in as a fiduciary, through choice of counsel, protecting the interests of those absent class members on whose behalf counsel will be prosecuting the case and settling or compromising their rights.

**B. End-Payor Co-Lead Class Counsel**

All counsel who submitted leadership applications boast impressive and significant experience in litigating pharmaceutical class claims. Each appears to have deep knowledge not only of class action law and procedure, but also of substantive antitrust law—particularly in the

pharmaceutical space.  Each pledges to commit the necessary human and financial resources to this litigation through its conclusion and to invest the necessary time and financial resources to ensure the efficient and successful resolution of this case on behalf of the class.  The competing applicants have those resources.

Although the question is close, the Court determines that the Cohen Milstein Group is best able to represent the interests of the putative class.

### 1. The work counsel has done in identifying or investigating potential claims in the action and the involvement of counsel in the litigation process.

The first Rule 23(g)(1)(A) factor requires the Court to consider the "work counsel has done in identifying or investigating potential claims in the action."  The Court also considers involvement in the early stages of the litigation.

Two competing applicants stand out for the work they have done in the early stages of the litigation—the Cohen Milstein Group and the joint application of Motley Rice LLC ("Motley Rice") and Bernstein Liebhard LLP ("Bernstein Liebhard") (together the "Motley Rice Group").  The Motley Rice Group claims to have first identified this case in June 2018 and filed the first End-Payor action.  *The City of Providence v. AbbVie Inc.*, No. 20-cv-5538, Dkt. No. 27.  It identifies the hours it has spent on the matter—150 hours—and recites that it prepared a consolidation motion for all Plaintiffs, a consideration which was mooted when this Court entered a similar order.  It also prepared and circulated organizational documents—a proposed Case Management Plan for all Plaintiffs' consideration and a letter to the Court regarding case management—and negotiated the disclosure of the relevant documents from the defendants.  *Id*.

The Cohen Milstein Group was not the first out of the block, but the ribbon does not always go to the fleetest of foot.  It may have been the more deliberate.  It filed the second and third End-Payor actions less than three weeks after the Motley Rice Group complaint, and it is

the only firm seeking a leadership position to have drafted, sent, and pled compliance with state law demand and notice requirements, a step which is necessary in some states to maintain a state antitrust claim.  *Mayor and City Council of Baltimore v. AbbVie Inc.*, No. 1:20-cv-5826, Dkt. No. 38 at 2; *Id.*, Dkt. No. 1 ¶¶ 217-21 (S.D.N.Y. 2020).  That may have avoided some unnecessary motion practice (and expense to the class) and may explain why it did not file more quickly.  *see In re Lipitor Anitrust Litig.*, 336 F. Supp.3d 395, 416 (D.N.J. 2018).  It points out that no End-Payor Plaintiff ("EPP") can claim originality with respect to the claims here; they followed on and largely tracked the allegations a lawsuit filed by J M Smith Corp., originally in the Northern District of California—which in turn were based largely on publicly filed documents.  *See id.* at 2.

The Cohen Milstein Group also says that it has led efforts to organize the EPPs, including by drafting and providing significant and substantive edits to filings and early case management documents, and to have worked with the Direct Purchasers to finalize a draft protective order and ESI protocol.  It states that it has coordinated between and among Plaintiff contingents and Defendants, and consulted with two experts to further develop the EPP's claims.  *Id.*

This factor speaks well to the respect and authority both the Cohen Milstein and the Motley Rice Groups have within both the plaintiff bar and with defense counsel.  The work done regarding organizational documents is relatively routine—that counsel were able to assume the roles they took reflects the view within the bar that they are each leaders.  Not surprisingly, each of the Cohen Milstein Group and the Motley Rice Group claim support of other lead plaintiffs— counsel in three of the other cases pending before this Court support the Cohen Milstein Group

application,[5] counsel in five others support the Motley Rice Group.[6] The factor does not tip decidedly in favor of either group as the counsel best able to represent the interests of the class.

### 2. The necessary experience, expertise, and knowledge of applicable law to carry out this litigation.

The second and third factors address "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action" and "counsel's knowledge of the applicable law." Fed. R. Civ. P. 23(g)(1)(A). The Court considers them together.

Although the question is close, these factors favor the Cohen Milstein Group. The Cohen Milstein Group notes that it has been involved in nearly every major pharmaceutical antitrust case, especially "pay-for-delay" schemes like the one allegedly at hand. *Mayor and City Council of Baltimore*, No. 1:20-cv-5826, Dkt. No. 38 at 3. It has secured the largest price-fixing verdict in United States history and one of the largest recoveries on behalf of an End-Payor class in a federal generic suppression case.[7] *Id.* The applications list participation in an impressive slate of representative matters, including a number of so-called pay-for-delay pharmaceutical antitrust

---

[5] Spector Roseman & Kodroff PC write to the Court, "we believe the best choice to serve the End-Payors as Lead Counsel is Sharon K. Robertson of Cohen Milstein Sellers & Toll and Robin van der Meulen of Labaton Sucharow." *Chinnery*, No. 1:20-cv-7177, Dkt. No. 4. Shepherd, Finkleman, Miller & Shah, LLP, meanwhile support the Cohen Milstein Group based on its history of working with both firms in pay-for-delay cases: "these exceptional lawyers and their firms have comprehensive knowledge of the pharmaceutical industry with extensive experience litigating pay-for-delay cases". *Fraternal Order of Police, Miami Lodge 20 Ins. Trust Fund*, No. 1:20-cv-7304, Dkt. No. 7.

[6] The Joseph Savari Law Firm writes to the Court, "we believe the appointment of Mr. Buchman and Ms. Beige is in the interest of the class and the interest of justice. . . we are confident that they will provide the highest qualify representation to the class as well as excellent experienced leadership." *City of Providence v. AbbVie, Inc.*, No. 1:20-cv-5538-LJL, Dkt. No. 29.

[7] *In re Lidoderm Antitrust Litig.*, No. 14-md-2521 (N.D. Cal. 2014). The firms' applications note that Cohen Milstein and Labaton Sucharow worked together as Co-Class Counsel in this $105 million recovery.

cases in which either Cohen Milstein or Labaton Sucharow (or both) have served as Lead or Co-Lead Class Counsel, demonstrating their long history of involvement in cases like the one before the Court.  *Id.*, 3, Ex. 1 at 9-10; *UFCW Local 1500 Welfare Fund*, No. 1:20-cv-5837, Dkt. No. 25 at 2-3.

At least one of the lead lawyers for each of the two leading applicants for Interim Class Counsel has over a decade of experience litigating pharmaceutical antitrust cases.  But, in the case of the Cohen Milstein Group, both of the lead lawyers have substantial experience with pharmaceutical antitrust cases, including pay-for-delay cases.  Moreover, counsel also has experience with the intricate legal issues surrounding class certification likely to play an important role in this case.  Finally, and importantly, not only do the two firms demonstrate experience in handling pharmaceutical antitrust cases independently, but they also have an extensive history of litigating such cases together.  The firms mention five class action suits—three in the pharmaceutical space—in which they have worked together as Co-Lead Counsel.[8] That the firms have this experience working together gives the Court some confidence that counsel will handle the matter effectively and efficiently, without duplicative costs that ultimately might come out of any recovery for the plaintiff class in this case.

The Court recognizes that one of the two lead lawyers for the Motley Rice Group appears to have been lead or co-lead counsel in more pay-for-delay cases than either of the proposed lead lawyers from the Cohen Milstein Group.  But, the determination of experience and knowledge,

---

[8] The firms' respective applications list the following cases: *In re Lidoderm Antitrust Litig,*, No. 14-md-2521 (N.D. Cal. 2014) (pharmaceutical generic suppression litigation); *In re Humira (Adalimumab) Antitrust Litig.*, No. 19-cv-01873 (N.D. Ill.) (same); *In re Opana ER Antitrust Litig.*, No. 14-cv-101150 (N.D. Ill.); *In re Generic Pharms. Pricing Antitrust Litig.*, No. 2:16-md-02724 (E.D. Pa.); see also *In re Treasuries Sec. Auction Antitrust Litig.*, No. 15-md-2673 (S.D.N.Y.) (price-fixing suit involving U.S. Treasuries).

and thereby the determination of the counsel best able to represent the interests of the class, cannot be based on mere mechanical nose count alone.  Such exercise would cement forever as incumbent the lawyer who numerically had the most cases and result in counsel who had the most lead counsel appointments always getting the most lead counsel appointment at the expense of counsel who is at least equally qualified and presents a more compelling application.

     **3. Additional factors for consideration.**

     Two other factors warrant mention, although they are not outcome-determinative in this case.

     First, each of the competing applicants highlight their commitment to diversity.  This is a relevant factor for the Court.  For well over a decade now, the courts have emphasized the importance of diversity in their selection of counsel.  *See, e.g.*, *In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265, 277 (S.D.N.Y. 2007) (recognizing a "diversity requirement"— that "at least one minority lawyer and one woman lawyer with requisite experience at the firm be assigned to this matter"); *see also In re Robinhood Outage Litig.*, No. 20-cv-01626-JD (N.D. Cal. July 14, 2020) (denying unopposed motion for appointment of lead counsel noting that all four of the proposed lead counsel are men and directing that leadership roles be provided to newer and less experienced lawyers); *Pub. Employees' Ret. Sys. of Miss. v. Goldman Sachs Group, Inc.*, 280 F.R.D. 130, 142 n.6 (S.D.N.Y. 2012) (noting the Court's Rule 23(g) conclusions "are subject to the Court being satisfied with. . . diversity in the class . . . and in the trial team); *In re Dynex Capital, Inc. Sec. Litig.*, 2011 WL 781215 at *9 (S.D.N.Y. Mar. 7, 2011) ("In considering other matters pertinent to counsel's ability to fairly and adequately represent the class. . . diversity is a factor of central importance"); *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 137–38 (E.D. La. 2013) (noting the importance of diversity in

appointment of lead counsel). *Cf. SEC v. Adams*, 2018 WL 2465763 at *4 n.6 (S.D. Miss. June 1, 2018) (discussing the importance of gender diversity within the legal profession).

There is an obvious social value in promoting diversity within the ranks of the legal profession. Historically, there has been a dearth of diversity within the legal profession. Although progress has been made, statistics reflect that today, still just one tenth of lawyers are people of color and just over a third are women.[9] A firm's commitment to diversity, though, does not just demonstrate that it shares with the courts a commitment to the values of equal justice under law. Rather, the intuition underlying the diversity criterion is soundly grounded in the Court's obligation to select counsel who will best represent the interests of the class. In particular, that a firm is able to field a diverse team provides some indication—albeit crude and imperfect—that the firm is one that is able to attract, train, and retain lawyers with the most latent talent and commitment regardless or race, ethnicity, gender, or sexual orientation. That intuition is recognized—and validated—by the views of a consensus of corporate general counsels of some of the leading companies in the United States, each charged with fiduciary duties to protect the interests of the absent shareholders and, on their behalf, to select counsel best able to represent the corporation. In their choice of counsel, they have emphasized the importance of a commitment to make efforts to ensure a diversity of minority and women lawyers in the associate and partner ranks.[10] There is no reason why the courts, faced with a

---

[9] Amer. Bar Ass'n, *ABA National Lawyer Population Survey: 10-Year Trend in Lawyer Demographics*, (2020).
https://www.americanbar.org/content/dam/aba/administrative/market_research/national-lawyer-population-demographics-2010-2020.pdf.
[10] Karen Donovan, *Pushed by Clients, Law Firms Step Up Diversity Efforts*, N.Y. TIMES (July 21, 2006), https://www.nytimes.com/2006/07/21/business/21legal.html.; GCs for Law Firm Diversity, *An Open Letter to Law Firm Partners*, available at:
https://www.law.com/americanlawyer/2019/01/27/170-gcs-pen-open-letter-to-law-firms-improve-on-diversity-or-lose-our-business/?slreturn=20200910163619

similar choice of selecting counsel, but this time on behalf of putative absent class members, should not consider and give weight to that same factor.

In this case, however, that factor is not outcome-determinative. The two leading competitors both offer women in leadership positions. One would have two women; the other would have a woman and a man. But both firms demonstrate a commitment to diversity through their ranks. There is no reason to think either harbors a lesser commitment to diversity and to recruiting, retaining, and promoting the most talented lawyers best able to represent the class. A commitment to diversity is not a commitment to quotas. *See Grutter v. Bollinger*, 539 U.S. 306, 334 (2003) (rejecting the use of racial quotas in the race-conscious affirmative action context while recognizing a compelling interest in promoting diversity).

Second, the Court considers the New York residence of the competing applicants. Private clients bringing or defending an individual lawsuit in New York frequently seek out counsel with a long-established presence in New York. That may be for several good reasons. Admission to the bar of the Southern District of New York requires and reflects a commitment to practice in this District and to abide by its rules and practices; it also requires an attestation of good character by a member of the bar. See U.S. Dist. Ct. Rules S.&E.D.N.Y., Civ. R. 1.3. At a practical level, counsel long admitted to this Court, and who plan to continue to practice in this Court, are presumptively steeped in its mores and traditions. That provides the Court some comfort that both those who will appear in Court and those who will operate behind-the-scenes in document production and deposition will adhere to and benefit from familiarity with those traditions. Finally, in terms of the sheer cost that will be charged to the class (in the event of recovery), a significant presence in New York for a litigation in New York against a New York defendant matters. This case will be tried in New York, arguments and motion practice will be

in New York, and presumably many of the depositions will be taken in New York.  Counsel who

are in New York will be able to handle those matters without travel.[11]

Although this factor too is not dispositive, it weighs slightly in favor of the Cohen Milstein

Group, in that both of the firms who are members of that group have long-established and

significant New York presences.

### C.  Direct Purchaser Interim Class Counsel

The same factors that weigh in favor of appointing interim class counsel in the End-Payor

Actions do not apply to the putative class action on behalf of the Direct Purchaser Plaintiffs.  As

a general matter, courts appoint class counsel when it certifies a class.  *See* Fed. R. Civ. P.

23(g)(1) ("a court that certifies a class must appoint class counsel").  After all, until a class is

certified and its size and composition determined by the court, the court cannot finally determine

either whether there is a need for class counsel at all or who is best situated to be class counsel.

Accordingly, "[g]enerally, courts will appoint interim class counsel only in the event that there

are 'a number of overlapping, duplicative, or competing suits pending in other courts, and some

or all of those suits may be consolidated,' with multiple attorneys vying for class counsel

appointment."  *Sullivan v. Barclays PLC*, 2013 WL 2933480, at *1 (S.D.N.Y. June 11, 2013)

(quoting MCL § 21.11) (citations omitted).  In the absence of such competing lawsuits, the work

that otherwise would be done by interim class counsel is done by the counsel who appears on

behalf of the named plaintiff seeking to represent the class.  After all, "[w]hether or not formally

designated interim counsel, an attorney who acts on behalf of the class before certification must

act in the best interests of the class as a whole.  For example, an attorney who negotiates a pre-

---

[11] The Court assumes that the restrictions currently imposed in connection with the Covid-19
pandemic will be lifted by the time the parties have completed motion practice.

certification settlement must seek a settlement that is fair, reasonable, and adequate for the class."  Advisory Committee Note to Fed. R. Civ. P. 23(g)(2)(A); *see also* MCL § 21.11 ("If the lawyer who filed the suit is likely to be the only lawyer seeking appointment as class counsel, appointing interim class counsel may be unnecessary.").  If the counsel chosen by the named plaintiff has done a capable job and demonstrated commitment to and expertise and investment in the claims of the putative class, those factors will weigh in favor of that counsel's selection as class counsel when and if a class is ultimately certified.  *See* Fed. R. Civ. P. 23(g)(1)(A) (court to consider the work counsel has done in identifying or investigating potential claims in the action, the resources counsel will commit to representing the class, and "any other matters pertinent to counsel's ability to fairly and adequately represent the interests of the class").  By the same token, if counsel has failed in those respects, that experience also will weigh against counsel's continuation to represent not only the putative class but the certified class.  By prematurely selecting the named plaintiff's counsel as interim class counsel, before there is any efficiency served by that selection, the Court can only be sending a message that it has prejudged the issue, granting that lawyer pride of position and perhaps unnecessarily deterring those who otherwise might be better able to represent the absent class members from entering the competition.

Those considerations determine the outcome of Gerstein & Fisher LLP and Berger Montague PC's joint application to be appointed interim class counsel here.  Gerstein & Fisher LLP and Berger Montague PC are the only two law firms that have filed a putative class action lawsuit and, although they filed two lawsuits, the two are on behalf of the same party.  There are no competing lawsuits.  Nor have Gerstein & Fisher LLP and Berger Montague PC demonstrated that there will be any efficiency or benefit to the putative class that will be achieved by appointment of them as interim class counsel that the putative class will not enjoy by virtue of

counsel's vigorous representation of the putative class as the only lawyers on behalf of the only named plaintiff. *See Sullivan v. Barclays PLC*, 2013 WL 2933480, at *1 (denying application for interim class counsel where the applicant has "not come forward with any showing as to why their appointment as interim class counsel would be beneficial or necessary").

## III.    Order

For the foregoing reasons, it is hereby:

ORDERED that the motion to appoint Sharon K. Robertson of Cohen Milstein and Robin van der Muelen of Labaton Sucharow as Interim Co-Lead Counsel for the putative class is GRANTED.  Cohen Milstein and Labaton Sucharow will be responsible for the overall conduct of the litigation on behalf of the putative class of End-Payor Plaintiffs, including providing supervision of all class Plaintiffs' counsel in this litigation. As Interim Co-Lead Class Counsel, Cohen Milstein and Labaton Sucharow have the authority to:

a.   Promote the efficient conduct of this litigation and avoid unnecessary duplication and unproductive efforts by making and supervising all work assignments;

b.   Prepare and file the Consolidated Class Complaint on behalf of the putative class, and any subsequent pleadings;

c.   Make, brief, and argue motions;

d.   Conduct all pretrial, trial, and post-trial proceedings on behalf of the putative class and act as a spokesperson for the putative class;

e.   Conduct and coordinate discovery on behalf of the putative class consistent with the Federal Rules of Civil Procedure, including preparation (or responses to) written discovery requests and examination (or defense) of witnesses in depositions;

f. Monitor activities of the plaintiffs' counsel to whom they delegate, when delegating with the permission of the Court, and implement procedures to ensure that schedules are met and unnecessary expenditures of time and funds are avoided by collecting from each firm regular time and expense reports;

g. Negotiate with defense counsel with respect to settlement and other matters;

h. Prepare any application for an award (or approval) of fees and reimbursement of expenses incurred by the putative class;

i. Consult with and retain expert witnesses for the putative class;

j. Negotiate with, retain, and manage relations with outside vendor(s) for the collection, processing, or review of documents and electronically stored information produced in discovery;

k. Conduct or coordinate all negotiations with defense counsel regarding search and production protocols, manage the review of documents produced by defendants and third parties (and production of documents by the putative class plaintiffs), and implement advanced analytics for the efficient review of documents as appropriate;

l. Coordinate and communicate as necessary with counsel for other parties in the litigation regarding any matters addressed in this Order in order to ensure efficient use of plaintiffs', defendants', and the Court's time;

m. Ensure that all Plaintiffs' counsel and Plaintiffs are informed of the progress of this litigation as necessary; and

n. Otherwise coordinate the work of Plaintiffs' counsel, coordinate with counsel for the End-Payor Plaintiff class, and perform such other duties as Interim Co-Lead Class

Counsel deem necessary and appropriate based upon their judgment and consideration or as authorized by further Order of the Court.

It is further ORDERED that the motions by other counsel for appointment as interim class counsel for the putative End-Payor class are DENIED.

It is further ORDERED that the motion to appoint interim class counsel for the putative Direct Purchaser class is DENIED.

It is further ORDERED that Interim Co-Lead Class Counsel may not delegate responsibility or assign legal work to other law firms without the prior approval of the Court. No firm to which to which Interim Co-Lead Counsel delegates responsibility, when delegating with the approval of the Court, may further sub-delegate the work without the prior approval of interim co-lead counsel and the Court.

It is further ORDERED that an Initial Pretrial Conference will be held on October 26, 2020 at 10:00 a.m. by TELEPHONE CONFERENCE.  At that date and time, the parties are directed to dial the Court's conference line at 888-251-2909 (access code: 2123101).

It is further ORDERED that, by October 22, 2020 at 5:00 p.m., interim class counsel for the End-Payor Actions and Defendants thereto, and counsel for the named plaintiff in the Direct Purchaser Actions and Defendants thereto, shall jointly file a single Case Management Plan and Scheduling Order which shall be filed in each of the Direct Purchaser Actions and in the consolidated End-Payor Action, No. 20-cv-5538, and shaLL include the following: (1) a uniform and identical date by which will be filed any amended complaint in the Direct Purchaser Actions and the consolidated amended complaint in the End-Payor Actions; (2) a uniform and identical date by which responsive papers will be due in both the Direct Purchaser and End-Payor Actions; (3)  a uniform and identical briefing schedule for any motions to dismiss filed in either

20

the Direct Purchaser or End-Payor Actions; (4) a uniform and identical schedule for discovery and post-discovery conferences and motions that will govern the Direct Purchaser and End-Payor Actions.  All deadlines for filing responsive papers are adjourned pending further order of the Court.

It is further ORDERED that by October 22, 2020 at 5:00 p.m., counsel in the Direct Purchaser Actions shall file a letter with the Court stating whether the two Direct Purchaser Actions should be consolidated.

It is further ORDERED that the End-Payor Actions be consolidated; the Clerk of Court is respectfully directed to consolidate the following cases under No. 20-cv-5538: No. 20-cv-7580; No. 20-cv-7352; No. 20-cv-5837; No. 20-cv-5813; No. 20-cv-7492; No. 20-cv-5826; No. 20-cv-7309; No. 20-cv-5901; No. 20-cv-6769; No. 20-cv-7177; No. 20-cv-6647; No. 20-cv-7296; No. 20-cv-7304.

SO ORDERED.

Dated: October 13, 2020
      New York, New York

                                        LEWIS J. LIMAN
                               United States District Judge

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

```
_____        :
KPH Healthcare Services, Inc.,                  :
a/k/a Kinney Drugs, Inc., et al.,               :        No. _____
                                                :
         v.                                     :
                                                :
Abbvie Inc., et al.                             :
_____        :
                                                :
KPH Healthcare Services, Inc.,                  :
a/k/a Kinney Drugs, Inc., et al.,               :        No. _____
                                                :
         v.                                     :
                                                :
Hetero USA Inc., et al.                         :
                                                :
_____        :
```

**[SAMPLE] ORDER**
**(TIME AND EXPENSE GUIDELINES AND REPORTS)**

AND NOW, this _____ day of _____ 2020, the Court hereby GRANTS

Plaintiffs' Unopposed Motion for Entry of a Pretrial Order re: Time and Expense Guidelines and

Reports and enters this Order to establish a protocol for the submission and review of attorneys'

fees and expenses by counsel for the Direct Purchaser Plaintiffs. Each attorney submitting a

monthly time and expense report pursuant to this Order shall be considered as representing to the

Court, under oath, that the time and expenses submitted meet the criteria set forth below. The

following protocol shall be used by any counsel for Direct Purchaser Plaintiffs who intends to

seek attorneys' fees and/or expense reimbursement from settlements/judgments relating to the

Seroquel cases.  Only time and expenses authorized by Lead Counsel and incurred on matters

that advance the common benefit effort will be considered as compensable.

**COMPENSABLE TIME**

Compensable common benefit work done on behalf of the Direct Purchaser class may include, but is not limited to:

• fact investigation and factual and legal research;

• preparation of research memoranda, pleadings and briefs;

• conducting document discovery (*e.g.*, reviewing, indexing, and coding documents);

• preparation for and attendance at depositions;

• preparation of and responding to written discovery requests;

• preparation for and attendance at hearings;

• attendance at meetings sponsored by Lead Counsel;

• work with clients;

• work with expert witnesses;

• settlement and settlement negotiations;

• trial preparation and trial; and

• performance of administrative matters specifically related to tasks assigned by Lead Counsel.

**NON-COMPENSABLE TIME**

**Common Benefit Work Does Not Include:**

• work not authorized by Lead Counsel;

• excessive time for a particular task;

• work performed by a person more senior than necessary for the task;

• duplicative time;

• "read and review" time unless specifically related to a task assigned by Lead Counsel;

• clerical time, such as faxing, copying, booking travel and preparing binders;

2

• time for which descriptions are missing or incomplete;

• time not submitted to Lead Counsel on a timely basis;

• internal firm time for firm management; and

• time related to fee issues; time spent preparing or reviewing time and expenses, unless the fee review or time reporting review is being done by assignment by Lead Counsel.

**RECORD KEEPING**

All time for each firm shall be maintained in tenth-of-an hour increments. Time entries not maintained in tenth-of-an-hour increments may be disallowed.

Counsel shall keep contemporaneous daily records of their time spent in connection with work on this litigation, clearly indicating with specificity the amount of time spent, particular activity, the source of authorization for the activity and indicating their position in the firm (Partner or equivalent, Of Counsel, Associate, Law Clerk, Paralegal or Contract Attorney). Current hourly rates are to be used in calculating time.

Full descriptions of the work performed are required. Time entries that are not sufficiently detailed will not be considered for payment. Block billing is not acceptable. The failure to secure the proper authority from Lead Counsel to incur common benefit time and expenses, to maintain and timely provide such records, or to provide a sufficient description of the activity will be grounds for denying the recovery of attorneys' fees or expenses in whole or in part.

Counsel for Direct Purchaser Plaintiffs must submit all time and expense reports monthly to Lead Counsel in the format supplied by Lead Counsel and in accordance with this Order.

**COMMON BENEFIT EXPENSES**

In order to be eligible for reimbursement of expenses, said expenses must meet the requirements of this section. Specifically, said expenses must be:

3

• for the common benefit;

• appropriately authorized by Lead Counsel;

• timely submitted;

• reasonable in amount; and

• supported by adequate documentation.

**Common Benefit Expenses Include:**

• assessments paid at the request of Lead Counsel;

• costs related to obtaining, reviewing, indexing, and paying for hard-copies of computerized images of documents;

• deposition and court reporter costs;

• costs for the electronic storage, retrieval and searches of ESI;

• Court, filing, and service costs;

• group administration matters, such as meetings and conference calls;

• reasonable travel expenses including lodging and meals, and expenses incurred in connection with Lead Counsel-approved meetings and other common benefit tasks;

• expert witness and consultant fees and expenses approved in advance by Lead Counsel;

• investigator fees and expenses approved in advance by Lead Counsel;

• printing, copying, coding and scanning;

• data and materials provided by outside third-party vendors, consultants and attorneys approved in advance by Lead Counsel;

• witness expenses, including travel;

• translation costs; and

• bank or financial institution charges.

**EXPENSE LIMITATIONS**

**Travel Expense Limitations**

Only reasonable expenses will be reimbursed. Except in extraordinary circumstances

approved by Co-Lead Counsel, all travel reimbursements are subject to the following limitations:

- Airfare: Only the price of a coach seat for a reasonable itinerary will be reimbursed. Business/First Class Airfare will not be fully reimbursed. Use of a private aircraft will not be reimbursed. If Business Class/First Class Airfare is used on domestic flights, then the difference between the Business Class/First Class Airfare and coach fare must be shown on the travel reimbursement form, and only the coach fare will be reimbursed.

- Hotel: Hotel room charges for the average available room rate of a business hotel, including the Hyatt, Westin, and Marriott hotels, in the city in which the stay occurred will be reimbursed. Unless a special discounted rate is negotiated, luxury hotels will not be fully reimbursed, but will be reimbursed at the average available rate of a business hotel.

- Meals: Meal expenses must be reasonable. Alcohol is not a reimbursable expense.

- Cash Expenses: Miscellaneous cash expenses for which receipts generally are not available (tips, luggage handling, short taxi rides etc.) will be reimbursed up to $50.00 per day, as long as the expenses are properly itemized.

- Rental Automobiles: Luxury automobile rentals will not be reimbursed. If luxury automobiles are selected when non-luxury vehicles are available, then the difference between the luxury and non-luxury vehicle rates must be shown on the travel reimbursement form, and only the non-luxury rate may be claimed, unless such larger sized vehicle is needed to accommodate several people.

- Mileage: Mileage claims must be documented by stating origination point, destination, total actual miles for each trip, and the rate per mile paid by the member's firm. The maximum allowable rate will be the maximum rate allowed by the IRS (currently $0.53.5 per mile).

**Non-Travel Expense Limitations**

- Long Distance and Cellular Telephone: Long distance and cellular telephone charges must be documented.

- Shipping, Courier, and Delivery Charges: All such claimed expenses must be documented.

5

- Postage Charges: A contemporaneous postage log or other supporting documentation must be maintained and submitted. Postage charges are to be reported at actual cost.

- Telefax Charges: Contemporaneous records should be maintained and submitted showing faxes sent and received. The per-fax charge shall not exceed $1.00 per page.

- In-House Photocopy: A contemporaneous photocopy log or other supporting documentation must be maintained and submitted. The maximum copy charge is $0.25 per page.

- Computerized Research: Claims for LEXIS or Westlaw, and other computerized legal research expenses should be in the exact amount charged to the firm for these research services by LEXIS or Westlaw. Verification of Expenses Attorneys shall keep receipts for all expenses. Credit-card receipts or monthly credit card statements are an appropriate form of verification. Hotel and restaurant costs must be proven by credit card statements, hotel invoice or restaurant bill. The description of unclaimed expenses on the statement or invoice may be redacted. Receipts need not be submitted on a monthly basis, but shall be maintained by the attorneys and may be requested later by Lead Counsel or the Court as a condition of payment.

## TIMING AND GENERAL INFORMATION

The first time and expense report must be submitted to Lead Counsel on or before

_____, 2020, and must include all time and expense entries from the inception of the

case through _____, 2020.

Counsel shall submit time and expense reports on a monthly basis. Such reports shall be

submitted no later than the last day of the month following the end of the month being reported.

For example, August reports are due no later than September 30.

Each submission must include a certification by a senior partner or shareholder in the

firm, attesting to the accuracy of the submission as to both time and expenses.

## SUMMARY REPORTS

Each time and expense report submission should include a summary report, using the

format applicable to Direct Purchaser Plaintiffs. The report should not be converted to any other

format.

6

**DETAILED REPORTS**

Each monthly submission should include a detailed time report with:

(1) the name and title of each person who performed common benefit work for the litigation during the reporting period;

(2) an itemization of the number of hours each person worked each day during the reporting period, in tenth-of-an-hour increments, separated by task category; and

(3) a detailed description of the work performed in relation to each task category on each day.

Each monthly submission should also include a detailed expense report that itemizes each expense incurred on each date, separated by expense category. Time and expense entries that are not sufficiently detailed will not be considered for payment.

**IT IS SO ORDERED.**

Dated: _____, 2020            _____
                                        LEWIS J. LIMAN,
                                        United States District Judge

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| KPH Healthcare Services, Inc., | : | |
| a/k/a Kinney Drugs, Inc., et al., | : | No. _____ |
| | : | |
| v. | : | |
| | : | |
| Abbvie Inc., et al. | : | |
| | : | |
| KPH Healthcare Services, Inc., | : | |
| a/k/a Kinney Drugs, Inc., et al., | : | No. _____ |
| | : | |
| v. | : | |
| | : | |
| Hetero USA Inc., et al. | : | |
| | : | |

## [PROPOSED] PROTECTIVE ORDER

LEWIS J. LIMAN, United States District Judge:

**WHEREAS**, discovery in this case will involve confidential documents or information the public disclosure of which will cause harm to the producing person and/or third party to whom a duty of confidentiality is owed, and to protect against injury caused by dissemination of confidential documents and information, this Court finds good cause for issuance of an appropriately tailored confidentiality order governing the pretrial phase of this action, pursuant to Federal Rule of Civil Procedure 26(c);

**WHEREAS**, this Protective Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords only extends to the limited information or items that are entitled, under the applicable legal principles, to confidential treatment; and

**WHEREAS**, this Protective Order does not create entitlement to file confidential information under seal;

1

**IT IS HEREBY ORDERED** that any person subject to this Protective Order—including without limitation the parties to this action, their representatives, agents, experts and consultants, all third parties providing discovery in this action, and all other interested persons with actual or constructive notice of this Protective Order—shall adhere to the following terms:

1.      Any person subject to this Protective Order who receives from any other person subject to this Protective Order any "Discovery Material" (*i.e.*, information of any kind produced or disclosed pursuant to and in course of discovery in this action) that is designated as "Confidential" or "Highly Confidential" pursuant to the terms of this Protective Order (hereinafter "Confidential Discovery Material") shall not disclose such Confidential Discovery Material to anyone else except as expressly permitted hereunder.

2.      The person producing any given Discovery Material may designate as Confidential only such portion of such material the public disclosure of which is either restricted by law or will cause harm to the business, commercial, financial or personal interests of the producing person and/or a third party to whom a duty of confidentiality is used and that consists of:

(a) previously nondisclosed financial information (including without limitation profitability reports or estimates, percentage fees, design fees, royalty rates, minimum guarantee payments, sales reports, and sale margins);

(b) previously nondisclosed material relating to ownership or control of any non-public company;

(c) previously nondisclosed business plans, product development information, or marketing plans;

(d) any information of a personal or intimate nature regarding any individual; or

(e) any other category of information hereinafter given confidential status by the Court.

3.      The person producing any given Discovery Material may designate as Highly Confidential only such documents, testimony, information, or other items that the Designating Party believes, in good faith, contain information the disclosure of which is likely to cause substantial harm to the competitive position of or compromise/jeopardize the business interests of the Designating Party, contain information subject to the right of privacy of any person, or contain information alleged to be a trade secret.

4.      With respect to the Confidential or Highly Confidential portion of any Discovery Material other than deposition transcripts and exhibits, the producing person or that person's counsel may designate such portion as "Confidential" or "Highly Confidential" by: (a) stamping or otherwise clearly marking as "Confidential" or "Highly Confidential" the protected portion in a manner that will not interfere with legibility or audibility as detailed below; and (b) producing for future public use another copy of said Discovery Material with the confidential information redacted.

(a) For information in documentary form (e.g., paper or electronic documents, including TIFF images but excluding written discovery and transcripts of depositions), designation shall be made by placing the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" on each page of any document or TIFF image that contains protected material prior to production; if only a portion or portions of the material on a page qualifies for protection, the designating Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins). Notwithstanding the foregoing, Excel documents or any other type of electronically stored information produced in native format ("Natively Produced ESI") containing

3

"CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" information need not be produced using a means sufficient to ensure that every page of such document, when printed, contains the appropriate mark or stamp. Instead, the designating Party shall use reasonable means to designate as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" such Natively Produced ESI, including where applicable and/or practicable, by (1) producing a TIFF placeholder image corresponding to the Natively Produced ESI that includes the "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" mark; (2) including "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" in the file name of the Natively Produced ESI; or (3) including "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" on the label of the media or in the production letter for the Natively Produced ESI.

(b) For written discovery in which "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" information is incorporated in answers to interrogatories, responses to requests for admission, or other written discovery, the designating Party must affix the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" on the first page of the written discovery and on each page containing answers or responses that contain such designated material.

(c) For information produced in tangible non-paper media (e.g., videotape, audiotape, compact discs, DVDs, flash drives, and computer disk), designation shall be made by affixing in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL." In the event a receiving Party generates any "hard copy," transcription, or printout from any such designated non-paper media, such party must stamp each page "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" as appropriate and the hard copy, transcription, or printout shall be treated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" under this Order.

5.      With respect to deposition transcripts, a producing person or that person's counsel may designate such portion as Confidential or Highly Confidential either by (a) indicating on the record during the deposition that a question calls for Confidential or Highly Confidential information, in which case the reporter will bind the transcript of the designated testimony (consisting of question and answer) in a separate volume and mark it as "Confidential Information Governed by Protective Order"; or (b) notifying the reporter and all counsel of record, in writing, within 30 days after a deposition has concluded, of the specific pages and lines of the transcript and/or the specific exhibits that are to be designated Confidential or Highly Confidential, in which case all counsel receiving the transcript will be responsible for marking the copies of the designated transcript or exhibit (as the case may be), in their possession or under their control as directed by the producing person or that person's counsel by the reporter. During the 30-day period following the conclusion of a deposition, the entire deposition transcript will be treated as if it had been designated Confidential or Highly Confidential.

6.      If at any time prior to the trial of this action, a producing person realizes that some portion(s) of Discovery Material that she, he, or it had previously produced without limitation should be designated as Confidential or Highly Confidential, she, he, or it may so designate by so apprising all prior recipients of the Discovery Material in writing, and thereafter such designated portion(s) of the Discovery Material will thereafter be deemed to be and treated as Confidential or Highly Confidential under the terms of this Protective Order.

7.      Notwithstanding the foregoing, in the event that (i) a document produced and designated by a non-party as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" is used as an exhibit in a deposition and (ii) counsel for the non-party is not present at the deposition, the exhibit shall remain designated "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" and that any

5

testimony concerning the exhibit shall be deemed to have been designated in writing as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" as is required in this Paragraph.

8.     No person subject to this Protective Order other than the producing person shall disclose any of the Discovery Material designated by the producing person as Confidential to any other person whomsoever, except to:

(a) the Parties to this action, their insurers, and counsel to their insurers;

(b) counsel retained specifically for this action, including any paralegal, clerical and other assistant employed by such counsel and assigned to this matter;

(c) outside vendors or service providers (such as copy-service providers and document-management consultants, graphic production services or other litigation support services) that counsel hire and assign to this matter, including computer service personnel performing duties in relation to a computerized litigation system;

(d) any mediator or arbitrator that the Parties engage in this matter or that this Court appoints, provided such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto;

(e) as to any document, its author, its addressee, and any other person indicated on the face of the document as having received a copy;

(f) any witness who counsel for a Party in good faith believes may be called to testify at trial or deposition in this action, provided such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto;

(g) any person retained by a Party to serve as an expert witness or otherwise provide specialized advice to counsel in connection with this action, provided such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto;

(h) court reporters or stenographers engaged to transcribe depositions conducted in this action; and

(i) this Court, including any appellate court, and the court reporters and support personnel for the same.

9.      No person subject to this Protective Order other than the producing person shall disclose any of the Discovery Material designated by the producing person as Highly Confidential to any other person whomsoever, except to the persons listed in paragraphs 8(b), 8(c), 8(d), 8(e), 8(g), 8(h), and 8(i). If either party wishes to show a producing person's "Highly Confidential" information to persons listed in paragraph 8(f) – other than to the producing person's witnesses and current employees – they must provide written notice of intent of such disclosure to the producing person at least seven (7) days before disclosure. The producing person then has the burden to: (1) demonstrate why such disclosure should not be made; and (2) if needed, move the Court to prohibit such disclosure.

10.     Prior to any disclosure of any Confidential Discovery Material to any person referred to in subparagraphs 8(d), 8(f) or 8(g) above, such person shall be provided by counsel with a copy of this Protective Order and shall sign a Non-Disclosure Agreement in the form annexed as an Exhibit hereto stating that that person has read this Protective Order and agrees to be bound by its terms. Said counsel shall retain each signed Non-Disclosure Agreement, hold it in escrow, and produce it to opposing counsel either prior to such person being permitted to testify (at deposition or trial) or at the conclusion of the case, whichever comes first.

11.     Any Party who objects to any designation of confidentiality may at any time prior to the trial of this action serve upon counsel for the designating person a written notice stating with particularity the grounds of the objection. If the Parties cannot reach agreement promptly, counsel

for all Parties will address their dispute to this Court in accordance with Paragraph 1(B) of this Court's Individual Practices in Civil Cases.

12.     Any Party who requests additional limits on disclosure (such as "attorneys' eyes only" in extraordinary circumstances) may at any time prior to the trial of this action serve upon counsel for the receiving Party a written notice stating with particularity the grounds for the request. If the Parties cannot reach agreement promptly, counsel for all Parties will address their dispute to this Court in accordance with Paragraph 1(B) of this Court's Individual Practices in Civil Cases.

13.     A Party may be requested to produce Discovery Material that is subject to contractual or other obligations of confidentiality owed to a third party. Within two business days of receiving the request, the receiving Party subject to such obligation shall inform the third party of the request and that the third party may seek a protective order or other relief from this Court. If neither the third party nor the receiving Party seeks a protective order or other relief from this Court within 21 days of that notice, the receiving Party shall produce the information responsive to the discovery request but may affix the appropriate controlling designation.

14.     Recipients of Confidential Discovery Material under this Protective Order may use such material solely for the prosecution and defense of this action and any appeals thereto, and specifically (and by way of example and not limitations) may not use Confidential Discovery Material for any business, commercial, or competitive purpose. Nothing contained in this Protective Order, however, will affect or restrict the rights of any person with respect to its own documents or information produced in this action. Nor does anything contained in this Protective Order limit or restrict the rights of any person to use or disclose information or material obtained independently from and not through or pursuant to the Federal Rules of Civil Procedure.

15.     Nothing in this Protective Order will prevent any person subject to it from producing any Confidential Discovery Material in its possession in response to a lawful subpoena or other compulsory process, or if required to produce by law or by any government agency having jurisdiction, provided, however, that such person receiving a request, will provide written notice to the producing person before disclosure and as soon as reasonably possible, and, if permitted by the time allowed under the request, at least 10 days before any disclosure. Upon receiving such notice, the producing person will have the right to oppose compliance with the subpoena, other compulsory process, or other legal notice if the producing person deems it appropriate to do so.

16.     All persons seeking to file redacted documents or documents under seal with the Court shall follow Rule 2(F) of this Court's Individual Practices in Civil Cases. No person may file with the Court redacted documents or documents under seal without first seeking leave to file such papers. All persons producing Confidential Discovery Material are deemed to be on notice that the Second Circuit puts limitations on the documents or information that may be filed in redacted form or under seal and that the Court retains discretion not to afford confidential treatment to any Confidential Discovery Material submitted to the Court or presented in connection with any motion, application or proceeding that may result in an order and/or decision by the Court unless it is able to make the specific findings required by law in order to retain the confidential nature of such material. Notwithstanding its designation, there is no presumption that Confidential Discovery Material will be filed with the Court under seal. The Parties will use their best efforts to minimize such sealing.

17.     All persons are hereby placed on notice that the Court is unlikely to seal or otherwise afford confidential treatment to any Discovery Material introduced in evidence at trial

or supporting or refuting any motion for summary judgment, even if such material has previously been sealed or designated as Confidential.

18.    Any Party filing a motion or any other papers with the Court under seal shall also publicly file a redacted copy of the same, via the Court's Electronic Case Filing system, that redacts only the Confidential Discovery Material itself, and not text that in no material way reveals the Confidential Discovery Material.

19.    Each person who has access to Discovery Material that has been designated as Confidential or Highly Confidential shall take all due precautions to prevent the unauthorized or inadvertent disclosure of such material, including copies, reproductions, summaries, or abstractions of the Confidential Discovery Material. All such copies, reproductions, summaries, extractions, and abstractions shall be subject to the terms of this Protective Order and shall be labeled accordingly.

20.    Any Personally Identifying Information ("PII") (*e.g.*, social security numbers, financial account numbers, passwords, and information that may be used for identity theft) exchanged in discovery shall be maintained by the persons who receive such information and are bound by this Protective Order in a manner that is secure and confidential. In the event that the person receiving PII experiences a data breach, she, he, or it shall immediately notify the producing person of the same and cooperate with the producing person to address and remedy the breach. Nothing herein shall preclude the producing person from asserting legal claims or constitute a waiver of legal rights or defenses in the event of litigation arising out of the receiving person's failure to appropriately protect PII from unauthorized disclosure.

21.    This Protective Order shall survive the termination of the litigation. Within 30 days of the final disposition of this action, all Discovery Material designated as "Confidential" or

"Highly Confidential," and all copies thereof, shall be promptly returned to the producing person, or, upon permission of the producing person, destroyed.

22.     All persons subject to this Protective Order acknowledge that willful violation of this Protective Order could subject them to punishment for contempt of Court. This Court shall retain jurisdiction over all persons subject to this Protective Order to the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any contempt thereof.

23.     Except as set forth explicitly herein, the entry of this Protective Order does not alter, waive, modify, or abridge any right, privilege, or protection otherwise available to any Party or non-party with respect to the discovery of matters, including but not limited to any Party's or non-party's right to assert the attorney-client privilege, the attorney work product doctrine, or other privileges, or any Party's right to contest any such assertion.

24.     The inadvertent production or disclosure of Confidential Discovery Materials or any other information (including documents) in this action that a producing Party later claims should not have been produced due to a privilege or protection from discovery, including but not limited to any attorney-client privilege, work product privilege, joint defense privilege, or settlement privilege, shall not be deemed to waive any such privilege or protection. A party or non-party may request the return or destruction of such information, which request shall identify the information and the basis for requesting its return. If a receiving Party believes that it has received information that may be subject to a claim of privilege or protection from discovery, the receiving Party shall promptly identify the information to the Producing Party.

25.     If a receiving Party learns that, by inadvertence or otherwise, it has disclosed Discovery Material designated Confidential or "Highly Confidential" to any person or in any circumstance not authorized under this Order, the receiving Party must immediately (a) notify in

11

writing the designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Confidential Discovery Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute a Non-Disclosure Agreement in the form annexed as an Exhibit hereto.

26.     Any Party for good cause shown may apply to the Court for modification of this Protective Order. This Order shall remain in full force and effect and each person subject to this Order shall continue to be subject to the jurisdiction of this Court, for the purposes of this Order, in perpetuity, and the Court shall not be divested of jurisdiction of any person or of the subject matter of this Order by the occurrence of conclusion of the Actions, or by the filing of a notice of appeal, or other pleading which would have the effect of divesting this Court of jurisdiction of this matter generally.

SO ORDERED

Dated:
      New York, New York

_____
LEWIS J. LIMAN
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| KPH Healthcare Services, Inc., | : | |
| a/k/a Kinney Drugs, Inc., et al., | : | No. _____ |
| | : | |
| v. | : | |
| | : | |
| Abbvie Inc., et al. | : | |
| | : | |
| KPH Healthcare Services, Inc., | : | |
| a/k/a Kinney Drugs, Inc., et al., | : | No. _____ |
| | : | |
| v. | : | |
| | : | |
| Hetero USA Inc., et al. | : | |
| | : | |

## <u>NON-DISCLOSURE AGREEMENT</u>

LEWIS J. LIMAN, United States District Judge:

      I, _____, acknowledge that I have read and understand the Protective Order in this action governing the non-disclosure of those portions of Discovery Material that have been designated as Confidential or Highly Confidential. I agree that I will not disclose such Confidential Discovery Material to any person or entity except in strict compliance with the provisions of this Protective Order. At the conclusion of the litigation, I will either return all discovery information to the party or attorney from whom I received it, or upon permission of the producing party, destroy such discovery information. By acknowledging these obligations under the Protective Order, I understand that I am submitting myself to the jurisdiction of the United States District Court for the Southern District of New York for the purpose of any issue or

13

dispute arising hereunder and that my willful violation of any term of the Protective Order could subject me to punishment for contempt of Court.


Dated: _____        Signature: _____

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| KPH Healthcare Services, Inc., a/k/a Kinney Drugs, Inc., et al., | : : : | No. _____ |
| v. | : | |
| Abbvie Inc., et al. | : : | |
| | : | |
| KPH Healthcare Services, Inc., a/k/a Kinney Drugs, Inc., et al., | : : : | No. _____ |
| v. | : | |
| Hetero USA Inc., et al. | : : : | |
| | : | |

**[PROPOSED] ORDER REGARDING PRODUCTION OF**
**DOCUMENTS AND ELECTRONICALLY STORED INFORMATION**

This Court adopts and orders the following protocol (the "ESI Protocol Order") for the production of electronically stored information ("ESI") which binds all parties and their counsel of record in all cases consolidated or coordinated in the above-captioned matters (the "Actions"), whether they currently are involved or become so in the future.

**I.      SCOPE AND LIMITATIONS**

A.      **Scope**. This ESI Protocol Order will govern the discovery and use of electronically stored information ("ESI") and Hard Copy Documents in the Actions and will complement and supplement the Federal Rules of Civil Procedure governing discovery. Any disclosures made pursuant to the ESI Protocol Order are subject to any other orders entered in the Actions.

B.     **Non-Waiver**. The Parties and their attorneys do not by this ESI Protocol Order waive their rights to any protection or privilege, including the attorney-client privilege and the work product doctrine. All Parties preserve their attorney-client privileges, work product protection, and other privileges, and there is no intent by the ESI Protocol Order, or Production pursuant to the ESI Protocol Order, to waive these privileges or protections. The Parties and their attorneys are not waiving and specifically reserve the right to object to any discovery requests on any grounds.

C.     **Confidentiality**. All disclosures and productions – including but not limited to all ESI productions – shall be subject to the Protective Order when entered by the Court in these Actions, the terms of which are expressly incorporated herein by reference. If a particular document or ESI item qualifies for confidential treatment pursuant to the terms of a court-ordered protective order entered in this case, or has been redacted in accordance with applicable law or court order, the confidentiality designation pursuant to the applicable Court order will be added by the producing Party prior to its production on the face of the document and in the file data field.

D.     **Modification by Agreement**. Any Party added or joined to any complaint in these Actions and any Party to actions that may be consolidated into or coordinated with the above-captioned matters after the date of this ESI Order that seeks to deviate from the ESI Order set forth herein must obtain leave of Court to do so unless all affected Parties otherwise consent in writing. Before seeking Court intervention, Plaintiffs and all affected Defendants shall meet and confer in good faith regarding any modification.

In light of the disparate data systems and architectures employed by various Parties, variations from this ESI Protocol Order may be required. In the event that any Party identifies a circumstance where application of this ESI Protocol Order is not technologically possible, would

be unduly burdensome or impractical, or when another process would satisfy the objective and reach the same result with less burden, the Party will notify the requesting party of the exception and before implementing an alternative, specify an alternative procedure that is not unduly burdensome or impractical that will be employed, if one exists. Upon request by the Requesting Party, those Parties will meet and confer regarding the circumstances and proposed alternative approaches.

E.    **Modification by Court Order**. Nothing in this ESI Protocol Order waives the right of any Party to petition the Court for an Order modifying its terms upon sufficient demonstration that compliance with such terms is either (1) unexpectedly and unreasonably burdensome, or (2) impossible, provided, however, that counsel for such party must first meet and confer with counsel for the opposing party and the parties shall use reasonable best efforts to negotiate an exception from or modification to this ESI Protocol Order prior to seeking relief from the Court.

## II.    DEFINITIONS

A.    "Backup Media" refers to magnetic tapes, CDS, DVDS, hard drives or other storage onto which Backup Systems store electronic information.

B.    "Backup systems" refers to computer systems used to store copies of active electronic information on Backup Media to permit recovery of the information in the event of loss or damage to the original data.

C.    "Custodian" shall mean any individual, department, business unit, or division of a party that has possession, custody, or control of information, documents, or data sources, or has access to Shared Storage Systems that may contain information potentially relevant to the Actions. For purposes of clarity, Custodian also includes those individuals that control or maintain Shared Storage Systems or other shared information sources that may contain information potentially

3

relevant to the Action, such as information technology personnel that maintain electronic mail systems, backup systems or backup media, or archival systems or storage.

D.      "Custodial data source" means any data source in which a Custodian may store ESI or Hard Copy documents, whether or not created or generated by a Custodian, including but not limited to personal computers, laptops, tablets, email whether stored locally or centrally, mobile devices, shared network servers, shared or individual network folders, cloud storage systems, structured data systems, or social media.

E.      "Documents" and "Electronically stored information" ("ESI") shall have the same definition as set forth in Federal Rule of Civil Procedure 34.

F.      "Extracted text" means the text extracted from a Native Document, and includes all header, footer and document body information when available. A "Text File" is a file containing the full text of native files extracted directly from the native file, or, in the case of paper/hard copy documents subject to OCR, a file containing the text resulting from the OCR.

G.      "Hard copy document" means a document that was maintained in paper form at the time these Actions commenced.

H.      "Load file" means an electronic file containing information identifying a set of paper-scanned images or processed ESI and indicating where individual pages or files belong together as documents, including attachments, and where each document begins and ends.  A Load File will also contain data relevant to the individual Documents, including extracted and user created Metadata, as well as OCR or Extracted Text, should such data be available.

I.      "Metadata"  means (i) information associated with or about a file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file which describes the characteristics, origins, usage or validity of the electronic file; and

4

(ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, saved, or otherwise manipulated by a user of such system.

J.      "Native format" means and refers to the file structure of a document created by the original creating application (in contrast to a Static Image, which is a representation of ESI produced by converting a native file into a standard image format capable of being viewed and printed on standard computer systems, such as .tiff or .pdf).

K.      "Network" or "Shared Storage Systems" shall mean any data storage device accessible to multiple users remotely over a computer network."

L.      "Non-Custodial Data Source" means any data source that is not kept or maintained by any particular Custodian but which may contain documents or data relevant to this action.

M.      "OCR file" means optical character recognition file which is created by software used in conjunction with a scanner that is capable of reading text-based paper/hard copy documents and making such documents searchable using appropriate software ("OCR software")

N.      "Parties" collectively shall mean all named parties to any action in these Proceedings, including any Party added or joined to any complaint in these Proceedings, as well as named parties to actions that may consolidated into or coordinated with the above-captioned Action.

O.      "Production" or "Produced" includes any exchange of documents or electronically stored information or hard copy documents between the parties, whether voluntarily or in response to a formal or informal request.

P.      "Producing party" means the party to the Actions producing documents in response to a formal or informal request for production of documents or information.

5

Q.      "Requesting party" means the party to the Actions requesting, formally or informally, the production of documents or information from a party or non-party.

R.      "Search Term" means a combination of words (including synonyms) and phrases designed to capture potentially relevant ESI, and includes strings of words and phrases joined by proximity and Boolean connectors or other syntax.

S.      "Static Image" means or refers to a representation of ESI produced by converting a native file into a standard image format capable of being viewed and printed on standard computer systems.

T.      Tagged Image File Format image is a graphic file format for storing bit-mapped images and bears the file name suffix ".tiff" or ".tif."  It is an example of a Static Image. A Group IV TIFF is a two-dimensional compression format for storing black and white images that typically compresses at a 20-to-1 ratio for standard business documents.

U.      "Structured data" means data that resides in a fixed field within a record or file, or stored in a structured format, such as databases (such as Oracle, SQL, Access) or data sets, according to specific form and content rules as defined by each field of the database.

## III.   ESI LIAISON

Each party shall designate a single individual through whom all e-discovery requests, responses, and disclosures are made and who shall participate in negotiations regarding ESI and e-discovery ("the e-discovery liaison"). The parties will rely on the e-discovery liaisons, as needed, to confer about ESI and to help resolve disputes without court intervention. Regardless of whether the e-discovery liaison is an attorney (in-house or outside counsel), a third-party consultant, or an employee of the party, he or she must be:

A.      Familiar with the party's electronic systems and capabilities in order to explain these systems and answer relevant questions;

B.      Knowledgeable about the technical aspects of e-discovery, including electronic document storage, organization, and format issues, as well as search procedures proposed or employed;

C.      Prepared to participate in e-discovery dispute resolutions; and,

D.      Responsible for organizing the party's e-discovery efforts to ensure consistency and thoroughness and, generally, to facilitate the e-discovery process.

## IV.    COOPERATION

A.      To facilitate the efficient and effective management of these Actions and to minimize unnecessary discovery disputes and motion practice, the Parties shall cooperate in good faith to attempt to reach agreement on cost effective search methodologies and quality assurance/quality control measures to be employed by the Parties, and to make the disclosures regarding such methodologies, date ranges, custodians, and noncustodial data sources, in advance of any search and/or collection in order to facilitate such agreement and advance the parties' negotiations.

B.      If a producing Party cannot comply in a particular circumstance with this ESI Protocol Order, such Party shall promptly inform the receiving Party in writing why compliance with the ESI Protocol Order is not reasonable or feasible.  No Party may seek relief from the Court concerning compliance or non-compliance with the Order until it has met and conferred with the other Party in a good faith effort to resolve or narrow the area of disagreement.

## V.    PRESERVATION

This ESI Protocol Order shall not abrogate any duties of the parties under the Federal Rules of Civil Procedure to properly preserve evidence.

## VI.    PRIMARY CUSTODIANS AND SEARCH TERMS

A.    Prior to collecting and processing any ESI, Each Party will investigate in good faith to identity the custodians and non-custodial sources, within each Party's possession, custody or control, who are likely to have ESI relevant to the Actions, hereafter referred to as "Primary Custodians." The Primary Custodians shall be identified by name, title, connection to this matter, and the type of information under his/her control. Following such disclosure, the parties shall meet and confer and use reasonable best efforts to reach agreement on the search methodology, including any search terms, if any, to be used, and the categories of document requests to which such search methodology(ies) shall and shall not be applied.

B.    The parties shall prior to performing any search or review, meet and confer about methods to search ESI in order to identify ESI that is subject to production in discovery and filter out ESI that is not subject to discovery. Any party that unilaterally conducts a document review applying search terms or any search or TAR methodology without consultation with the opposing party does so at its own risk and may waive the right to later argue undue burden or lack of proportionality should new searches be required.

C.    Nothing in this section shall limit a Party's right to reasonably seek agreement from the Parties or a Court ruling to modify previously agreed-upon search terms or other search parameters at any time prior to completion of discovery. If, during discovery, the requesting Party has a reasonable good-faith basis to request discovery from additional custodians ("Additional

Custodians") or using additional search parameters, the Parties shall meet and confer concerning the appropriateness of such discovery.

D.      The parties shall meet and confer according to the provisions that follow. If the parties cannot reach agreement following negotiations, they shall bring their disputes to the Court for resolution in a timely manner.

## VII.   PRODUCTION FORMAT AND PROCESSING SPECIFICATIONS

With the exception of spreadsheets, presentation files, multi-media files and other native files that cannot be converted to image files, the Parties shall produce all relevant, responsive, and non-privileged ESI as Bates-stamped single-page 1-bit TIFF images with a DAT load file that enables the document to be uploaded and viewed using standard litigation support software in accordance with the provisions below. Unless excepted below, single page, 1-bit, black and white Group IV TIFFs should be provided, at least 300 dots per inch (dpi) for all documents. Original document orientation should be maintained (i.e., portrait to portrait and landscape to landscape). Where the TIFF image is unreadable or has materially degraded the quality of the original, the producing party shall provide a higher quality TIFF image or the native or original file. Parties reserve the right to request specific documents in another form if an image is not reviewable or additional relevant information can be obtained in a different form. To the extent reasonably practicable, ESI items shall be process using a consistent time zone by all of the Parties: (e.g., GMT), and the time zone shall be disclosed to the requesting party.

A.      **Production of Documents not Reasonably Comprehensible in TIFF format.** Spreadsheet files (e.g., Microsoft Excel files), database files, and any other file types that reasonably require viewing in their native format for a full understanding of their content must be produced in their native file format with a TIFF image placeholder. Any files not easily converted

to or reviewable in image format must be produced in their native file format, including but not limited to audio/video files. Documents produced natively shall be represented in the set of imaged documents by a slip sheet indicating the production identification number and confidentiality designation for the native file that is being produced.

B.       **Optical Character Recognition.** To the extent that documents have been run through optical character recognition ("OCR") software, the full text shall be provided on a document-level basis in an appropriately formatted text file (.txt) that is named to match the first bates number of the document. Text files shall be provided in a "Text" folder. To the extent that a document is redacted, the text files shall not contain the text of the redacted portions, but shall indicate where the redactions were made, *e.g.* with the notation "REDACTED."

C.       **Technology Assisted Review ("TAR") and Similar Advanced Analytics.**  If a producing party elects to use TAR or similar advanced analytics as a means of including or excluding Documents to be reviewed for responsiveness or of culling or otherwise limiting the volume of information to be reviewed for responsiveness, prior to use of such tool the requesting party and producing party shall meet and confer as to (1) the custodial data sources and non-custodial data sources against which TAR will be run; (2) the TAR or advanced analytics vendor and methodology being deployed; (3) the quality control measures used to validate the results of the TAR methodology or similar advanced analytics, (4) any Documents, Document types, file types or other categories that the producing party proposes to exclude from the TAR process and the method of identifying such Documents to be excluded, (5) other disclosures that are reasonably necessary for the requesting party to evaluate the proposed TAR process.  To the extent a producing party proposes to use search terms to pre-cull ESI prior to application of TAR and/or advanced analytics, prior to doing so, they shall meet-and-confer with the requesting party

regarding whether pre-culling is appropriate and if so, how it is to be applied.  If the requesting party and producing party are unable to agree on the TAR and/or advanced analytics technology and methods being proposed after meeting and conferring in good faith, the requesting party and producing party shall notify the Court of their unresolved dispute(s) and seek resolution by the Court or an appointed discovery master.

D.     **Electronic Production of Physical/Hard Copy Documents.**  Nothing herein shall relieve the Parties of any obligations they may have to search for responsive Documents in physical or hard copy form. Whenever practicable, documents that are located solely in physical hardcopy format are to be scanned and produced as text-searchable TIFFs imaged at 300 dpi in lieu of photocopy production in their physical form. If the producing party determines that it is not reasonably possible, the producing party shall notify the requesting party. Bates numbers, confidentiality designations (in accordance with any protective order governing the case), and redactions (to the extent they are necessary) shall be burned into the image. The metadata shall indicate document breaks and identify the custodian or non-person custodial source from whom/where the document was collected. The documents should be logically unitized (i.e., distinct documents should not be merged into a single record, and a single document should not be split into multiple records) and should be produced in the order in which they are kept in the usual course of business. The ".tiff" files shall be subject to an OCR process. The OCR software should maximize text quality over process speed. Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process. The Parties will meet and confer to address instances of undue burden and will work to negotiate an appropriate solution.

E.     **Production Media.** The Parties shall produce documents in an encrypted format through electronic means, such as external hard drives, secure file sharing methods (*e.g.*, FTP), or

readily accessible computer or electronic media (*e.g.*, CDs, DVDs) (collectively, "Production Media"), with explicit decryption instructions. Productions shall have the following four directories: (1) IMAGES for the images; (2) DATA for the .dat and .opt files; (3) TEXT for the extracted text/OCR files; and (4) NATIVES for any native Excel or other files that cannot be understood reasonably unless displayed in native format. The producing party shall identify: (i) the Responding Party's name; (ii) the production date; and (iii) the Bates Number range of the materials contained on the Production Media.

F.      **Color.** If a receiving party finds the black and white version of a document insufficient, the receiving party may request that the producing party provide a color image or native file of such document. The producing party will not unreasonably deny a request to provide a color image and shall reproduce the document(s) in color, if reasonably accessible, within 5 business days of receiving the request. Color images should be produced as single page JPG files at 300dpi with JPG compression and a high-quality setting as to not degrade the original image.

G.      **Unique IDs.** Each TIFF image shall be produced using a unique file name that will be the Bates number of that page (*e.g.*, ABC000001.TIFF). The Bates number must appear on the face of the image and not obliterate, conceal, or interfere with any information from the source document.

H.      **Parent-Child Relationships.** Parent-child relationships (association between an attachment and its parent document) shall be preserved. The attachment(s) shall be produced adjacent to the parent document, in terms of Bates numbers, with the first attachment being named with the next sequential number after the parent, and any additional attachment(s) sequentially numbered after that first attachment.

I.     **Redactions.** If the Parties are redacting information from a page, they shall electronically "burn" the word "Redacted" onto the page or otherwise clearly indicate a redaction at or reasonably near to the location of the redaction(s). If documents that Parties have agreed to produce in native format need to be redacted, the Parties shall meet and confer in good faith on how to best produce the documents so that proper formatting and usability are maintained.

J.     **Confidentiality Designation.** Responsive documents in TIFF format shall be stamped with the appropriate confidentiality designations in accordance with any protective order entered in the Actions. Each responsive document produced in native format shall have its confidentiality designation indicated on its corresponding TIFF placeholder.

K.     **Metadata Fields.** To the extent reasonably possible, the Parties shall provide the system generated metadata fields (the "Production Fields") as set forth in **Appendix A**. If the producing party believes the Production Fields are not reasonably possible to produce, the producing party shall notify the requesting party within five business days of learning such information.

L.     **Text Files.** For each produced document, a document-level text file shall be provided in addition to the image files (TIFFs). The text of documents originating in native format should be extracted directly from the native file and each text file will be named using its corresponding beginning bates number (*e.g.*, ABC000001.TXT). For ESI with redacted text, a commercially acceptable technology for Optical Character Recognition ("OCR") shall be used for all scanned, hard copy documents with redactions.

M.     **Databases and Other Structured Data.** The parties shall meet and confer regarding the production format and scope of data contained in enterprise database or database management system (e.g., Oracle, SQL server, DB2), including the types of information stored in

the database(s), the types of reports that can be generated from or for the data, whether there are existing and reasonably available reports that include the information, and whether the receiving Party will need any information in native form in order to ensure that any information produced is reasonably usable by the receiving party and that its production does not impose an undue burden. To avoid doubt, information will be considered reasonably usable when produced in CSV format (assuming proper text qualifiers), tab-delimited text format, Microsoft Excel format, or Microsoft Access format. Subject to reasonable requests by the receiving party, the producing party shall provide a description of each field produced, as well as database schema, codes, values and abbreviations used to populate a data field, and other information necessary for the requesting party to understand the nature and function of the structured data source and the meaning of structured data produced. The Parties reserve all rights to object, including but not limited to objections for relevance, undue burden, and/or inaccessibility.

Should the meet and confer result in production of information from a database in an alternate, static format, such as a report or data table, any report/data table that is produced will be deemed authentic and an accurate representation of information included in the counterpart database. Moreover, a Party that withholds any part of a database as non-responsive may not later rely on such withheld information unless the Party produces such information to the other Party within a reasonable time.

N.    **Password Protected Files.** The producing party shall produce passwords for any password-protected files to the extent the passwords are reasonably available.

O.    **Embedded Documents.** Embedded ESI documents (e.g. a spreadsheet embedded within a word processing document) will be extracted, produced as independent document records and related back to the respective top level parent document (e.g., standalone file, email message,

etc.) via the BegAttach and EndAttach fields referenced in Appendix A. Related embedded documents will be produced within a continuous Bates range. Certain embedded documents (such as embedded logos, signatures, OLEObjects, images or pictures, and systems and/or container files (*e.g.*, OLE2, .bin, and similar files that hold embedded files but which do not contain user data)) need not be extracted. If the producing party determines that other embedded documents should or cannot be extracted, the producing party shall notify the requesting party and the parties will meet and confer to address any issues within three business days or as soon as reasonably possible thereafter.

P.      **Compressed Files.** Compression file types (e.g., .CAB, .GZ, .RAR. .ZIP), shall be decompressed to ensure that a compressed file within a compressed file are decompressed into the lowest possible compression resulting in individual folders and/or files.

Q.      **Email and Attachments**.  Each email and its attachment(s) must be produced as separate documents, sequentially Bates stamped with the family relationship intact.

R.      **Replacement Productions.**  Any replacement production will be transmitted with a cover letter or email to identify the production as a replacement and cross-reference the BegBates and EndBates of the documents being replaced. If the replacement production is being transmitted by physical media, the media shall include the phrase "Replacement Production."

## VIII.   THIRD-PARTY ESI

A.      A Party that issues a non-Party subpoena (the "Issuing Party") shall include a copy of this ESI Protocol Order and the order concerning confidentiality agreed and/or entered in this litigation with the subpoena and state that the Parties in the litigation have requested that third-Parties produce documents in accordance with the specifications set forth herein.

B.      The Issuing Party shall produce a copy to all other Parties of any documents and ESI (including any metadata) obtained under subpoena to a non-Party.

C.      If the non-Party production is not Bates-stamped, the Issuing Party will endorse the non-Party production with unique Bates prefixes and numbering scheme prior to reproducing them to all other Parties.

D.      Parties shall identify any third parties to which they have given notice of preservation and the date of that notice.

## IX.    DEDUPLICATION

A.      A Party is only required to produce a single copy of a responsive document. To the extent exact duplicate documents reside within a Party's ESI data set, the Party shall produce only a single, deduplicated copy of a responsive document.  "Exact duplicate" shall mean bit-for-bit identity of the document content with exact hash value matches; so-called "near duplicates" will not be included within this definition.

B.      **Vertical Deduplication**. A Producing Party may de-duplicate ESI vertically by Custodian, provided however, that an email that includes content in the BCC or other blind copy field shall not be treated as a duplicate of an email that does not include content in the BCC or other blind copy field, even if all remaining content in the email is identical.

C.      **Horizontal Deduplication**. A Producing Party may de-duplicate ESI horizontally (globally) across the population of records, if the Producing Party discloses to the Requesting Party that it has deduplicated horizontally, and provided further that: (a) an email that includes content in the BCC or other blind copy field shall not be treated as a duplicate of an email that does not include content in the BCC or other blind copy field, even if all remaining content in the email is identical; and (b) all Custodians who were in possession of a de-duplicated Document must be

identified in the CustodianOther Metadata fields specified in **Appendix A**.  To ensure accuracy, the Custodian and CustodianOther Metadata fields must be captured by an automated process and cannot be populated using a manual process.  The aforementioned Metadata must be produced to the extent it exists.  In the event of a rolling production of documents or ESI items, the Producing Party shall provide an overlay load file with updated CustodianOther Metadata fields along with each production.  The Metadata overlay may contain a full refresh of data for the CustodianOther fields or be a supplement to the information previously provided for the fields.   At the time of production, the Producing Party shall identify the overlay as a full refresh or a supplement.  A Metadata overlay file shall be either a full refresh overlay or a supplemental overlay but shall not contain a full refresh for one Metadata field and a supplement for the other Metadata field.

D.     The Court recognizes that a Producing Party using a centralized system (or "journaling") as a preservation and backup system for email may not possess certain Metadata, such as "Importance." Where documents are produced from such a centralized system, in the production cover letter the Parties shall, to the extent practicable, identify the centralized system in the "Source" Metadata field for the documents produced from such system, or identify by Bates rage which Documents are being produced from a centralized system.

E.     To the extent a party de-duplicates its documents, it shall de-duplicate stand-alone documents or entire document families in their ESI sources by the use of MD5, SHA-1, or SHA256 hash values.  Where any such documents have attachments, hash values must be identical for both the document plus-attachment (including associated metadata) as well as for any attachment (including associated metadata) standing alone. The resulting hash value for each item shall be reflected in the HashValue field specified in **Appendix A**.

F.      Removal of duplicate documents should only be done on exact duplicate documents (based on MD5 or SHA-1 hash values, at the family level only). Attachments should not be eliminated as duplicates for purposes of production, unless the parent email and all attachments are also duplicates.

G.      No Party shall identify and/or eliminate duplicates by manual review or some method other than by use of the technical comparison using MD5 or SHA-1 hash values outlined above.

H.      Email threads are email communications that contain prior or lesser-included email communications.  A most inclusive email thread is one that contains all of the prior or lesser-included emails and attachments, including each branch of the email thread. A producing party may not use e-mail threading to suppress prior-in-time emails from production; however, the producing party may use email threading as a review efficiency tool.

I.      Hard-Copy Documents shall not be eliminated as duplicates of ESI.

## X.      ASSERTIONS OF PRIVILEGE

Pursuant to Rule 26(b)(5) of the Federal Rules of Civil Procedure, a producing party may withhold a document or redact portions of a document only if the document withheld or the portions redacted are protected by attorney-client privilege or the work-product doctrine.

A.      **Privilege Logs:**  Privilege logs shall be provided in Excel format and shall contain the following information**:**

      1.      a sequential number associated with each privilege log record;

      2.      the date of the document;

      3.      the Bates numbers of documents redacted;

4.      the identity, title, and employer of all persons who sent, authored, signed or otherwise prepared the document, and identification of which, if any, of them are attorneys;

5.      the identity, title, and employer of all persons designated as addressees or copyees, including identification of which, if any of them, are attorneys;

6.      the title or subject of a document, to the extent the title does not reveal privileged or protected information;

7.      a description of the contents of the document that, without revealing information itself privileged or protected, is sufficient to understand the subject matter of the document and the basis of the claim of privilege or immunity;

8.      the type or nature of the privilege asserted (i.e., attorney-client privilege; work product doctrine).

B.      **Logging of Document Families:**  Each member of a document "family" (e.g., an email attaching a memorandum or other document) that is withheld or redacted on the grounds of privilege, immunity or any similar claim shall be individually logged on the privilege log in succession following the redacted or withheld parent document.  For document families in which fewer than all of the documents are withheld or redacted as privileged or protected, the privilege log entry for the withheld document(s) shall identify the Bates number of the produced family member along with a general description of the produced family member(s).

C.      **Timely Production:**  Privilege logs shall be produced within 30 days following production of the producing party's first production volume and shall be supplemented within 30 days following each subsequent production where production occurs on a rolling basis, or by another date upon agreement of the producing and requesting parties. For documents produced

19

prior to entry of this ESI Protocol Order, a privilege log for such productions shall be provided to the requesting party within thirty (30) days of entry of this ESI Protocol Order.

## XI.   COST SHIFTING

The costs of production pursuant to this ESI Protocol Order shall be borne by the Producing Party. However, no Party waives or relinquishes any right or interest it may have under the Rules of Civil Procedure to seek cost shifting or apportionment for the costs of electronic discovery.

**DATED: _____**

**APPROVED AND SO ORDERED:**

_____
LEWIS J. LIMAN,
United States District Judge

**Appendix A: ESI Metadata and Coding Fields**

| Field Name | Field Description |
|---|---|
| BegBates | The Bates number (production number) assigned to the first page of the document |
| EndBates | Last Bates number (production number) of an item.<br>**The EndBates field shall be populated for single-page items. |
| BegAttach | The Bates number assigned to the first page of the parent document in a document family (i.e. Bates number of the first page of the first attachment). |
| EndAttach | The Bates number assigned to the last page of the last child document in a document family (i.e. Bates number of the last page of the last attachment). |
| NameAttach | Email attachments receives the file name and extension |
| CountAttach | The number of Attachments. |
| PageCount | The number of pages in the item. |
| Custodian | Name of person from whose files the item is produced. |
| Author | The creator of the document; any value populated in the Author field of the source file metadata or document properties. |
| CustodianOther | Name of the person(s), in addition to the Custodian, from whose files the item would have been produced if it had not been de-duplicated (e.g., all custodians who had a copy of the document in their possession). |
| BCC | The names and SMTP email addresses of all recipients that were included on the "BCC" line of the email or calendar item, as blind carbon copy recipients. |
| CC | The names and SMTP email addresses of all recipients that were included on the "CC" line of the email or calendar item, as carbon copy recipients. |
| DateCreated (mm/dd/yyyy) | The date a document was created. |
| TimeCreated (hh:mmAM/PM) | The time a document was created. |
| DocType | The application associated with the original document extension. |
| DocExt | The original document extension of the native file as it existed on the custodian's computer (e.g., doc, nsf, rft, pdf, etc.). |
| FileName | The original name of the native file as it existed on the custodian's computer. |
| From | The name and SMTP email address of the sender of the email or calendar item. |
| DateLastModified (mm/dd/yyyy) | The date a document was last modified. |
| TimeLastModified (hh:mmAM/PM) | The time a document was last modified. |
| NativeLink | The filepath to where the produced native file can be found on the production media. |

| Field Name | Field Description |
|---|---|
| ParentDate | The date associated with a family's parent record, which is assigned as follows: Date Sent, Date Received, Date Last Modified, Date Created. |
| Subject | Any value populated in the Subject field of the source file metadata or document properties (e.g., subject line of email or calendar item). |
| DateReceived | The date an email or calendar item was received. |
| DateSent (mm/dd/yyyy) | The date an email or calendar item was sent. |
| To | The names and SMTP email addresses of all recipients that were included on the "To" line of the email or calendar item. |
| EmailConversationIndex | The relative position of the email within a conversation thread. |
| EmailSubject | The subject line of an email. |
| Text | A link to a file which contains the extracted text when possible or OCR text. |
| Email Thread ID | Unique identification number that permits threading of email conversations. For instance, unique MS Outlook identification number ("PR_Conversation_Index") is 22 bytes in length, followed by zero or more child blocks each 5 bytes in length, that permits email threading in review software. |
| TimeRecieved | The time an email was received. |
| TimeSent (hh:mmAM/PM) | The time an email or calendar item was sent. |
| SourceParty | The producing party. |
| RecordType | To indicate "Paper," "Hard Copy," or "HC" if a hard copy document and "ESI" if it is an ESI item. |
| ProductionVolume | Production volume name or number. |
| Imortance | Email importance flag. |
| ImportanceRanking | Level of importance/sensitivity of messages or calendar items. |
| File Size | The size (in kilobytes) of the source native file. |
| Title | Any value populated in the Title filed of the source file metadata or item properties. |
| MessageID | The unique message identifier generated by the source email or calendar system. |
| PreviousMessageID | The MessageID of the previous message in the email thread (the message that was replied to or forwarded). |
| HashValue | The MD5 or SHA-1 hash value of the file. |
| SourceFilePath | The directory structure or path where the original file was stored on the party's source computer system, ending in the filename. Any container name (such as ZIP or PST containers) is included in the path. |
|  |  |

# EXHIBIT 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ROBINHOOD OUTAGE LIGITATION | Master File No. 20-cv-01626-JD<br><br>**ORDER RE CONSOLIDATION AND INTERIM CLASS COUNSEL** |

Plaintiffs have moved to consolidate the related cases before the Court, and for appointment of interim class counsel. Dkt. Nos. 38, 43. Defendant Robinhood does not oppose either request. Dkt. No. 42. Consolidation is ordered. Appointment of interim counsel is denied without prejudice to a further submission consistent with this order.

**CONSOLIDATION OF RELATED CASES**

1.    This order applies to these cases:

    a.    3:20-cv-01626-JD

    b.    3:20-cv-01769-JD

    c.    3:20-cv-01800-JD

    d.    3:20-cv-01877-JD

    e.    3:20-cv-01909-JD

    f.    3:20-cv-02286-JD

    g.    3:20-cv-02343-JD

    h.    3:20-cv-02352-JD

    i.    3:20-cv-02594-JD

    j.    3:20-cv-02665-JD

United States District Court
Northern District of California

1       k.   3:20-cv-02669-JD

2       l.   3:20-cv-03218-JD

3       m.  3:20-cv-03550-JD

4       2.    Pursuant to Fed. R. Civ. P. 42(a), the Court consolidates these cases into Civil

5   Action No. 20-1626 for all pretrial proceedings before this Court. All filings and submissions

6   from here on will be captioned: "*In re Robinhood Outage Litigation*" under the 3:20-cv-01626-JD

7   case number.

8       3.    If a related action is subsequently filed in or transferred to this District, it will be

9   consolidated into this action for all pretrial purposes. This order will apply to every new related

10  action, without further order of the Court. A party that objects to consolidation, or to any other

11  provision of this order, may file an application for relief within 14 days after the notice of related

12  case is filed as discussed in Paragraph 8.

13      4.    This order is entered without prejudice to the rights of any party to apply for

14  severance of any claim or action, for good cause shown.

15      5.    Pretrial consolidation does not mean that the actions will necessarily be

16  consolidated for trial. That issue will be decided later in the case. It also does not have the effect

17  of making any entity a party in any action in which he, she, or it has not been named, served, or

18  added in accordance with the Federal Rules of Civil Procedure.

19  **MASTER DOCKET**

20      6.    The docket in Civil Action No. 16-1626 will constitute the master docket, and the

21  file in that action will be the master file for every action in the consolidated action.

22      7.    When a pleading applies to some, but not all, of the member actions, the document

23  must list the docket number for each individual action to which the document applies immediately

24  under the master caption. Any document not identified in that way will be presumed to apply to

25  all member cases.

26      8.    The parties must file a notice of related case pursuant to Civil Local Rule 3-12

27  whenever a case that should be consolidated into this action is filed in, or transferred to, this

28  District. If the Court determines that the case is related, the Clerk of the Court is requested to:

2

United States District Court
Northern District of California

a. file a copy of this order in the separate file for such action;

b. serve on plaintiff's counsel in the new case a copy of this order;

c. direct that this order be served upon defendants in the new case; and

d. make the appropriate entry in the master docket sheet (No. 3:20-cv-01626-JD).

9.     If there are any disputes about whether a new action should be related to this consolidated action, they must promptly be brought to the Court's attention or any objection may be deemed waived.

## INTERIM CLASS COUNSEL

10.     Pursuant to Fed. R. Civ. P. 23(g)(3), Kaplan Fox & Kilsheimer LLP and Cotchett Pitre & McCarthy LLP have requested appointment as interim co-lead counsel to represent the putative class of plaintiffs. They propose a number of committee and liaison counsel to assist in the litigation. Robinhood takes no position on these requests.

11.     The Court has no doubt that Kaplan Fox and Cotchett Pitre, and the individual lawyers identified to be lead counsel, would provide highly professional and sophisticated representation to plaintiffs. The firms and the individual attorneys have an impressive history of successful engagements as class counsel in this District. *See, e.g.,* Dkt. No. 38 at 8-11. Even so, the Court is not prepared to appoint them at this time. The Court is concerned about a lack of diversity in the proposed lead counsel. For example, all four of the proposed lead counsel are men, which is also true for the proposed seven lawyers for the "executive committee" and liaison counsel. *Id.* at 8, 11-12. In addition, the proposed counsel appear to be lawyers and law firms that have enjoyed a number of leadership appointments in other cases. While this experience is likely to benefit the putative class, it highlights the "repeat player" problem in class counsel appointments that has burdened class action litigation and MDL proceedings. Counsel with significant prior appointments are by no means disqualified from consideration here, but leadership roles should be made available to newer and less experienced lawyers, and the attorneys running this litigation should reflect the diversity of the proposed national class. Consequently, the Court denies the interim counsel request. Plaintiffs may renew the request in a manner that addresses the Court's concerns.

12. As further guidance for a renewed motion, the Court's goal is that any party seeking fees at the end of this litigation will be able to present to the Court clear and definitive records that were prepared as the fees and costs were incurred. A prolonged forensic accounting exercise or mini-trial on fees and costs is to be avoided. To that end, a renewed motion should incorporate these practices:

    a. At the close of each calendar month, interim co-lead counsel will make sure that all time has been entered by all timekeepers in final form. By 14 days after each month's end, interim co-lead counsel will ensure that a bill for the prior month is finalized, reflecting lead counsel's review of the billing records and any write-downs or write-offs by interim co-lead counsel for inefficiencies, duplication of effort, misjudgments in staffing, and the like. These final bills for each month will be segregated and kept by lead counsel, and may not be altered. Only these records, prepared contemporaneously with the expenditures, may be used for a fees and costs motion.

    b. Time will be recorded in one-tenths of an hour.

    c. Block-billing time records are not permitted. Time must instead be recorded by task. For example, an attorney may not record "7.8 hours" for "work on motion to dismiss opposition." Instead, the attorney must break out the 7.8 hours specifying the amount of time spent for each specific task performed, e.g., "review and analyze motion to dismiss brief (1.3); team meeting regarding arguments for opposition (.8); legal research re X argument (3.3); draft X section of opposition brief (2.4)."

    d. Interim co-lead counsel are free to make staffing decisions as they deem appropriate, but the Court will not permit fees to be recovered for multiple attorneys performing duplicative work. For example, barring an unusual circumstance, only one lawyer should attend a deposition when defending it, and no more than two lawyers should attend when taking a deposition. The Court will not permit the recovery of fees for every attorney from every firm to

4

review each discovery request and response, motion, letter, e-mail, etc. in the case. While each attorney should stay informed about the litigation, only the attorneys designated by interim lead counsel to review or summarize pleadings, orders and communications are working for the common benefit of the putative class, and only their time will be considered for possible payment at the conclusion of this case.

e.  Air travel of less than six hours should be in coach class. Travel exceeding six hours of flight time may be booked in business class. In all cases, flights should be booked at the lowest available fare.

f.  When overnight travel is necessary, counsel should be mindful in selecting reasonable hotel accommodations and restaurants. Per diem expenses for travel days should not exceed $125 per person exclusive of lodging and transportation.

g.  Failure to adhere to these guidelines -- or the spirit animating them -- will result in the exclusion of consideration for the relevant fee or cost request.

## BRIEFING SCHEDULE

13.     The Court has no objection to the schedule proposed by the parties, Dkt. No. 38 at 14, but defers issuing a scheduling order until the interim counsel issue is resolved.

**IT IS SO ORDERED.**

Dated: July 14, 2020

JAMES DONATO
United States District Judge

# EXHIBIT 8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE ROBINHOOD OUTAGE
LITIGATION

Master File No. 20-cv-01626-JD

**ORDER RE INTERIM CLASS
COUNSEL AND BRIEFING
SCHEDULE**

In this consolidated action, the Court denied without prejudice plaintiffs' proposed appointments for interim lead class counsel, liaison counsel, and an "executive committee" over concerns about a lack of diversity and "repeat player" issues. Dkt. No. 59 at 3. Plaintiffs promptly filed an amended proposal that significantly broadened in multiple ways the diversity of the attorneys designated for the interim roles. Dkt. No. 62. The revised composition meets the concerns the Court raised, and so the Court makes the following appointments pursuant to Rule 23(g)(3) of the Federal Rules of Civil Procedure.

**INTERIM LEAD CLASS COUNSEL**

1.  Anne Marie Murphy of Cotchett, Pitre & McCarthy, LLP, and Matthew B. George of Kaplan Fox & Kilsheimer LLP are appointed as interim lead class counsel in the consolidated action on behalf of the putative class of Robinhood customers in the United States alleging contract, tort, and consumer protection claims arising out of the March 2020 outage. Interim lead counsel and their firms meet the requirements for appointment of class counsel in Fed. R. Civ. P. 23(g)(1) in that they have performed substantial work on behalf of the putative class, have facilitated the consolidation of the various Robinhood actions in this Court, and have the knowledge and experience necessary to effectively represent the putative class.

**EXECUTIVE COMMITTEE AND LIAISON COUNSEL**

2.      Plaintiffs have proposed an executive committee and liaison counsel (Dkt. No. 62 at 10-11):

| Attorney | Firm and Location |
|---|---|
| Courtney M. Werning | Meyer Wilson<br>Columbus, Ohio |
| Leslie Pescia | Beasley Allen<br>Montgomery, Alabama |
| Susana Cruz Hodge | Lite DePalma & Greenberg<br>Newark, New Jersey |
| Rachele Byrd | Wolf Haldenstein<br>San Diego, California |
| Jamisen Etzel | Carlson Lynch<br>Pittsburgh, Pennsylvania |
| Erin Comite | Scott + Scott<br>Colchester, Connecticut |
| Brandon Taaffe | Shumaker Loop & Kendrick<br>Sarasota, Florida |
| Tina Wolfson | Ahdoot & Wolfson<br>Los Angeles, California |
| Steve A. Lopez (Liaison Counsel) | Gibbs Law Group<br>Oakland, California |

3.      The Court, like many others, is leery of committees and liaison counsel roles because they can lead to inefficiencies in handling the litigation, and undue complications should the case reach the point of an award of fees and costs. Even so, the Court will defer to the discretion of attorneys Murphy and George in organizing the representation of plaintiffs. Interim lead counsel may delegate the work of prosecuting the consolidated complaint to members of the executive committee or liaison counsel in a manner consistent with the fair and efficient administration of the case. As interim lead counsel, attorneys Murphy and George will be held accountable for the overall conduct of the litigation.

**AUTHORITY AND RESPONSIBILITIES**

4.      Interim lead counsel have complete authority over, and responsibility for, the representation of plaintiffs. This includes, without limitation: (1) the initiation, response, scheduling, briefing, and argument related to all pleadings or motions; (2) the scope, order, and conduct of all discovery proceedings; (3) retaining common experts; (4) designating the

United States District Court
Northern District of California

United States District Court
Northern District of California

appearance of plaintiffs' counsel at hearings and conferences; (5) leading common settlement negotiations and entering into prospective agreements with Robinhood; (6) receiving and distributing among plaintiffs' counsel, as appropriate, notice of all Court orders and notices of pretrial conferences and acting as the primary contact between the Court and plaintiffs' counsel; (7) establishing and maintaining a depository for orders, pleadings, hearing transcripts, and all documents served upon plaintiffs' counsel; (8) establishing and maintaining a current master service list of counsel of record; (9) establishing procedures for submitting and reviewing periodic time and expense reports of plaintiffs' counsel to determine if the time and expenses are being spent appropriately and for the benefit of the putative class, including providing periodic reports to the Court if requested; and (10) all other pre-trial matters concerning the efficient and economical conduct of the consolidated action.

5.      Interim lead counsel also have complete authority over, and responsibility for:  (1) assigning work to other plaintiffs' counsel, as may be appropriate and in the putative class's best interest; (2) implementing time and expense record keeping policies; (3) collecting time and expense reports from all plaintiffs' counsel on a monthly basis; (4) acting as the treasurer for any litigation fund assessments and expenses; and (5) otherwise ensuring that plaintiffs' counsel not perform common benefit work, bill for unnecessary read and review time, or attend hearings, depositions, or other events without interim lead counsel's authorization.

6.      Robinhood and its counsel may rely on the conduct and representations of interim lead counsel on behalf of the putative class for any issue in the litigation.

## FEES, COSTS, AND EXPENSES

7.      In its prior order, the Court discussed guiding principles on billing practices, fees, costs, and expenses.  Dkt. No. 59 at 4-5.  These principles are adopted and ordered.

8.      Interim lead counsel are expected to be vigilant in ensuring the efficient and economical prosecution of this matter.  A request for an award of fees and costs may be based only on records that were prepared as the fees and costs were incurred.  A prolonged forensic accounting exercise or a mini-trial on fees and costs are to be avoided.  To that end, interim lead counsel will ensure that the following practices are adhered to by all counsel who perform work on

United States District Court
Northern District of California

behalf of the putative class:

    a) At the close of each calendar month, interim lead counsel will make sure that all time has been entered by all timekeepers in final form. By 14 days after each month's end, interim co-lead counsel will ensure that a bill for the prior month is finalized, reflecting lead counsel's review of the billing records and any write-downs or write-offs by interim co-lead counsel for inefficiencies, duplication of effort, misjudgments in staffing, and the like. These final bills for each month will be segregated and kept by lead counsel, and may not be altered. Only these records, prepared contemporaneously with the expenditures, may be used for a fees and costs motion.

    b) Time will be recorded in one-tenths of an hour.

    c) Block-billing time records are not permitted. Time must instead be recorded by task. For example, an attorney may not record "7.8 hours" for "work on motion to dismiss opposition." Instead, the attorney must break out the 7.8 hours specifying the amount of time spent for each specific task performed, e.g., "review and analyze motion to dismiss brief (1.3); team meeting regarding arguments for opposition (.8); legal research re X argument (3.3); draft X section of opposition brief (2.4)."

    d) Interim lead counsel are free to make staffing decisions as they deem appropriate, but the Court will not permit fees to be recovered for multiple attorneys performing duplicative work. For example, barring an unusual circumstance, only one lawyer should attend a deposition when defending it, and no more than two lawyers should attend when taking a deposition. The Court will not permit the recovery of fees for every attorney from every firm to review each discovery request and response, motion, letter, e-mail, etc. in the case. While each attorney should stay informed about the litigation, only the attorneys designated by interim lead counsel to review or summarize pleadings, orders and communications are working for the common benefit of the putative

4

class, and only their time will be considered for possible payment at the conclusion of this case.

e) Air travel of less than six hours should be in coach class.  Travel exceeding six hours of flight time may be booked in business class.  In all cases, flights should be booked at the lowest available fare.

f) When overnight travel is necessary, counsel should be mindful in selecting reasonable hotel accommodations and restaurants.  Per diem expenses for travel days should not exceed $125 per person exclusive of lodging and transportation.

g) Failure to adhere to these guidelines -- or the spirit animating them -- will result in the exclusion of the fee or cost request.

**BRIEFING SCHEDULE**

9.      At the parties' joint request, Dkt. No. 38 at 14, plaintiffs may file an amended consolidated complaint by August 21, 2020.  Robinhood will respond to the consolidated complaint within 45 days.  If Robinhood moves to dismiss, plaintiffs will have 45 days to respond.  Robinhood may reply to plaintiffs' response within 30 days.  Robinhood need not respond to any complaint previously filed or served in the consolidated action.

**IT IS SO ORDERED.**

Dated:  July 22, 2020

_____
JAMES DONATO
United States District Judge

United States District Court
Northern District of California

5

# EXHIBIT 9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                     MDL NO. 2924
PRODUCTS LIABILITY                              20-MD-2924
LITIGATION

**JUDGE ROBIN L. ROSENBERG**
**MAGISTRATE JUDGE BRUCE E. REINHART**

_____/

**THIS DOCUMENT RELATES TO: ALL CASES**

**PRETRIAL ORDER # 20**
**Order Establishing the Plaintiffs' Leadership Structure,**
**Appointing Leadership Members and Designating Leadership Duties**
**and Responsibilities**

On May 6 and 7, 2020, the Court held interviews of sixty-two (62) applicants for leadership positions in this multi-district litigation (MDL). The Court, having reviewed all submissions by counsel, including all applications for leadership positions pursuant to PTO # 1, all disclosures and certifications submitted pursuant to PTO #16, and all initial census data submitted pursuant to PTO #15, and having considered the interviews conducted by videoconference, due to the inability of the Court to conduct the interviews in person in light of the coronavirus pandemic, issues this Order to, among other things, (1) establish the Plaintiffs' leadership structure; (2) appoint the Plaintiffs' leadership members; and (3) designate the Plaintiffs' leadership duties and responsibilities.

**I.      PLAINTIFFS' LEADERSHIP**

The Court is grateful to all counsel who had the interest and took the time to apply for leadership positions through their written submissions and oral presentations. It is an enormous personal commitment of time, dedication and resources to lead an MDL of this size and nature. There were many well-qualified candidates for leadership positions and choosing among the

1

applicants was a difficult task. In doing so, the Court has considered many factors, including the individual applicant's skill, experience, background, ethical standards, professionalism, collaboration, other leadership positions, and reputation earned from colleagues and judges in other litigation.

The disclosures submitted by the leadership applicants provided the Court with the necessary added assurance that the applicants did not have any conflicts that would compromise their ability to carry out the important role of serving in a leadership role in this litigation. The disclosures also further the goal of instilling transparency in the overall process of managing this case and, thereby, promotes confidence in the attorneys selected to act on behalf of so many others who will rely greatly upon their good judgment and fair dealing. As indicated at the hearing, the Court found no issues involving any actual or perceived conflicts from the disclosures. For purposes of transparency and informing the ongoing discussion of financial disclosures, the Court further notes that no applicant disclosed any third-party litigation financing.

In addition to the individual applicant's profile, the Court also considered the depth and quality of the applicant's firm, the experience and qualifications of any co-counsel, and the depth and quality of co-counsel's firm. In so doing, the Court sought to draw not only from the many prominent nationally known firms that sought leadership, but also from smaller firms as well as newer firms, recognizing that each type of firm brings unique and different capacities to the litigation.

The Court also sought to appoint a diverse leadership team that is representative of the inevitable diversity of the Plaintiffs in this case, and a team that affords younger and slightly less experienced attorneys an opportunity to participate in a leadership role in an MDL. The Court

2

sought to create a team that would collectively bring to bear both wisdom and judgment, and also new approaches and ideas. The Court was particularly impressed by the number of applicants who have started their own firms, especially the number of female founding partners who applied for roles in this litigation — while also noting that at only 31% female applicants, much work remains to be done to give judges an applicant pool that reflects the diversity of not only our society but our profession, particularly at the senior levels of leadership. So too, the Court noted that only a small subset of the applicants identified as non-Caucasian, and that no attorneys identified as LGBTQ or disabled, underscoring the breadth of these continuing challenges. However, quantitative metrics are only one measure. Through the interview process, the applicants displayed a remarkable diversity of life experiences, whether as veterans, immigrants, or individual life stories not easily categorized here but which the Court values. The Court hopes that as the litigation moves forward, the leadership team will endeavor to build on the diversity of its team. The Court also hopes that all counsel and parties will be mindful in using this MDL to provide an opportunity for a broader array of attorneys to have experiences that position them to take on more senior roles in future MDLs.

The Court further recognizes the importance of ensuring adequate representation in the leadership team for the full range of cases currently pending in the MDL and anticipated to be filed in the MDL, as reflected in the initial census data, pursuant to PTO #15. Specifically, the Court sought to ensure appropriate representation of anticipated economic injury putative class action cases on behalf of consumers and third-party payors; medical monitoring cases; as well as the range of personal injury/wrongful death cases reflected in the census. The Court recognizes that these needs may change as the MDL advances, and will continue to monitor to ensure that the various types of claimants are being appropriately and adequately represented.

The Court hopes and assumes that counsel appointed to leadership positions will take full advantage of the range of talent among other counsel, whether through the formation of appropriate subcommittees or otherwise — and that other counsel, including those who applied for leadership positions, will provide assistance as appropriate. In particular, the Court believes that certain staffing decisions should be left to its Lead Counsel, to ensure the leadership team will function well together — with both creative and diverse ideas, and yet a common vision. The Court hopes the Lead Counsel will consider drawing upon the resources of the many excellent firms not selected in this order as they build those subcommittees, in furtherance of their vision for the litigation. The Court will consider additional Steering Committee appointments as the litigation advances, recognizing the work performed by subcommittee members. The quality of the litigation will be greatly enhanced by the collective input of the talent of all of the attorneys in the litigation, guided and supported by the leadership team. Many attorneys gain invaluable experience and earn outstanding reputations from the work that they contribute to an MDL, without any formal leadership position, and this does not go unnoticed by their colleagues and the Court.

The Court was advised by certain applicants that the work of more junior attorneys can often be behind-the-scenes, such that neither the Court nor senior leadership is aware of those attorneys' contributions — and thus senior leadership are unable to recommend them when they apply for leadership positions in future MDLs. The Court recognizes there are similar challenges on the defense side. This Court will look to its leadership team — that appointed here for the Plaintiffs, and that which it anticipates appointing for the defendants — to be mindful of how they will ensure that junior attorneys are recognized for their contributions in this MDL. More broadly, the Court takes this opportunity to advise all parties of its preference that the attorneys

actually negotiating a particular issue, drafting a brief or proposed order, or dealing with a specific matter be available to speak to that matter in court — a structure the Court hopes will further facilitate opportunities for counsel at all levels.

## II.    PLAINTIFFS' LEADERSHIP STRUCTURE

The Court puts the following leadership structure in place based on all of the available information that the Court has at this time.  The Court recognizes it is appropriate to proceed with the adoption of a structure for leadership, and to appoint counsel to those positions, notwithstanding the many additional cases that continue to be transferred to and direct filed in this MDL.  If the composition and/or numerosity of cases in this MDL changes significantly throughout the litigation, the Court recognizes that it may need to revisit or modify the structure of leadership and/or specific appointments, as more fully described below.  The Court believes in a centralized framework that avoids disadvantages of an overly elaborate infrastructure, provides ample resources for vigorous prosecution, delivers strong and flexible leadership, and encourages counsel to avoid unnecessary duplication of efforts and to control fees and expenses in this litigation.  To those ends, the Court finds that Plaintiffs' leadership should be structured as follows, which includes a brief description of the leadership duties and responsibilities (with a more detailed description set forth in Section B below):

### a) Co-Lead Counsel

The Court appoints four (4) Co-Lead Counsel for all economic loss, medical monitoring and injury/wrongful death cases (collectively, "Lead Counsel").  Lead Counsel will have the duties outlined in the MANUAL FOR COMPLEX LITIGATION (FOURTH) ("MCL Fourth") Section 10.221, which include formulating (in consultation with other counsel) and presenting positions

on substantive and procedural issues during the litigation. The authority, duties and responsibilities of Lead Counsel are more specifically set forth in Section B, below.

### b) Steering Committee

The Court establishes a Steering Committee for all economic loss, medical monitoring, and injury/wrongful death cases. The Steering Committee will have the duties outlined in the MANUAL FOR COMPLEX LITIGATION (FOURTH)("MCL Fourth") Section 10.221, which include preparing briefs or conducting portions of the discovery program. The Steering Committee is established to ensure that all group members' interests and positions are represented in decision making.

### c) Plaintiffs' Liaison Counsel

The Court previously appointed Francisco Maderal as the Plaintiffs' Liaison Counsel, in PTO #5. Plaintiffs' Liaison Counsel will be responsible for facilitating communications with the Court and counsel in this action. Liaison counsel will also assist all counsel in complying with the rules and procedures of this Court. In addition, Mr. Maderal will serve in an ex-officio capacity on the Steering Committee; in this role he will have the same responsibilities as all other members of the Steering Committee.

### d) Leadership Development Committee

This Court is keenly aware of the concerns raised in recent years about the challenges faced by less experienced attorneys in obtaining leadership appointments in MDL proceedings. While this Order is not the time or place for an exhaustive discussion of this issue, suffice it to say that this Court is sensitive to these concerns, as well as the need to have more experienced MDL practitioners lead and populate steering committees to adequately represent the interests of plaintiffs in large, complex and costly MDL matters. The Court views these concerns as

complimentary, rather than mutually exclusive. In an attempt to balance the needs of this MDL, as set forth below, this Court hereby establishes a Leadership Development Committee (LDC).

The LDC consists of attorneys who applied for leadership positions in this MDL, but whom the Court did not select for appointment to the PSC. The Court was impressed by the insights of each of these applicants and sees the potential in each of them to become leaders within the MDL bar. The Court believes these attorneys will benefit from the mentorship and experience gained from participation in a large and complex MDL, and that the MDL will equally benefit from their enthusiasm and fresh perspective. The attorneys appointed to the LDC, most of whom have not previously been appointed to an MDL steering committee, shall be mentored by and work with those attorneys appointed to the PSC. It is the Court's expectation that the PSC members will actively mentor and work closely with the attorneys appointed to the LDC so they have the opportunity to play a meaningful role in various aspects of this MDL, including subcommittee assignments, and thereby gain further experience in preparation for future service on steering committees.

The Court also directs that Special Master Dodge shall meet periodically with LDC members individually, and with the Co-Chairs of the LDC, to ensure that they are receiving appropriate opportunities for their ability and skills, including the opportunity to present before this Court. To the extent that any Order of this Court conflicts with the ability of the LDC to effectuate the Court's intent in this regard — for example, limitations that may be imposed through the anticipated common benefit order on staffing and travel, or the number of presenters at hearings — Lead Counsel may request individual waiver of these restrictions, which the Special Master is hereby granted authority to approve in her discretion without the need for future Order of this Court.

A.    **Plaintiffs' Leadership Appointments**

The Court makes the following appointments:

*Lead Counsel*:

Tracy A. Finken
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Telephone: (215) 735-1130
Email: tfinken@anapolweiss.com

Robert C. Gilbert
KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Telephone: (305) 384-7269
Email: gilbert@kolawyers.com

Michael L. McGlamry
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Telephone: (404) 523-7706
Email: efile@pmkm.com

Adam Pulaski
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Telephone: (713) 664-4555
Email: adam@pulaskilawfirm.com

*Steering Committee:*

Rosemarie Riddell Bogdan
MARTIN, HARDING & MAZZOTTI
1222 Troy-Schenectady Road
PO Box 15141
Albany, NY 12212
Telephone: (518) 862-1200
Email: rosemarie.bogdan@1800law1010.com

Mark J. Dearman
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Email: mdearman@rgrdlaw.com

Elizabeth A. Fegan
FEGAN SCOTT LLC
150 South Wacker Drive, 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Email: beth@feganscott.com

Marlene J. Goldenberg
GOLDENBERGLAW, PLLC
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Telephone: (612) 333-4662
Email: mjgoldenberg@goldenberglaw.com

Roopal P. Luhana
CHAFFIN LUHANA LLP
600 3rd Avenue, Floor 12
New York, NY 10016
Telephone: (888) 480-1123
Email: luhana@chaffinluhana.com

Ricardo M. Martinez-Cid
PODHURST ORSECK, P.A.
SunTrust International Center
One SE 3rd Avenue, Suite 2300
Miami, FL 33130
Telephone: (305) 358-2800
Email: rmcteam@podhurst.com

Lauren S. Miller
CORY WATSON, P.C.
2131 Magnolia Avenue South
Birmingham, AL 35205
Telephone: (205) 328-2200
Email: lmiller@corywatson.com

Melanie H. Muhlstock
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Telephone: (516) 466-6500
Email: mmuhlstock@yourlawyer.com

Daniel A. Nigh
LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Telephone: (850) 435-7013
Email: dnigh@levinlaw.com

Carmen S. Scott
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
Telephone: (843) 216-9160
Email: cscott@motleyrice.com

Mikal C. Watts
WATTS GUERRA LLP
Four Dominion Drive
Building Three, Suite 100
San Antonio, TX 78257
Telephone: (210) 447-0500
Email: mcwatts@wattsguerra.com

Sarah N. Westcot
BURSOR & FISHER, P.A.
2665 South Bayshore Drive, Suite 220
Miami, FL 33133
Telephone: (305) 330-5512
Email: swestcot@bursor.com

Conlee S. Whiteley
KANNER & WHITELEY, L.L.C.
701 Camp Street
New Orleans, LA 70130
Telephone: (504) 524-5777
Email: c.whiteley@kanner-law.com

R. Brent Wisner
BAUM HEDLUND ARISTEI & GOLDMAN, P.C.
10940 Wilshire Boulevard, 17th Floor
Los Angeles, CA 90024
Telephone: (310) 207-3233
Email: rbwisner@baumhedlundlaw.com

Frank Woodson
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
PO Box 4160
Montgomery, AL 36106
Telephone: (334) 269-2343
Email: frank.woodson@beasleyallen.com

*Leadership Development Committee:*

Paige Boldt
WATTS GUERRA LLP
Four Dominion Drive
Building Three, Suite 100
San Antonio, TX 78257
Telephone: (210) 447-0500
Email: pboldt@wattsguerra.com

Je Yon Jung
MAY LIGHTFOOT, PLLC
3200 Martin Luther King Jr. Avenue SE
3rd Floor
Washington, DC 20032
Telephone: (202) 918-1824
Email: jjung@maylightfootlaw.com

Adam William Krause
KRAUSE AND KINSMAN, LLC
4717 Grand Avenue, Suite 250
Kansas City, MO 64112
Telephone: (816) 760-2700
Email: adam@krauseandkinsman.com

Nicola Larmond-Harvey
SAUNDERS & WALKER, P.A.
3491 Gandy Boulevard North, Suite 200
Pinellas Park, FL 33781
Telephone: (727) 579-4500
Email: nicola@saunderslawyers.com

Bradford B. Lear
LEAR WERTS LLP
103 Ripley Street
Columbia, MO 65201
Telephone: (573) 875-1991
Email: lear@learwerts.com

All of the foregoing appointments are personal in nature.  That is, although the Court expects that appointees will draw on the resources of their firms, their co-counsel, and their co-counsel's firms, each appointee is personally responsible for the duties and responsibilities that he or she assumes.  However, if any counsel appointed to a leadership position leaves his or her firm during the course of this litigation, counsel must immediately notify the Court, at which time the Court may reassess counsel's role in a leadership position.  If the Court allocates common benefit monies at the conclusion of the litigation, the Court may consider all firms with which counsel has been affiliated during the litigation and the contributions that each firm has made to the litigation. There should be no expectation that all benefits will be afforded to one firm or another.

The Court will consider a process for periodically evaluating leadership appointees' performance and commitment to the tasks assigned, as well as the ongoing needs of the litigation. The Court anticipates that this evaluation will happen on an approximately annual basis; but this timing will be adjusted as circumstances warrant and at a time that minimizes any disruption to the litigation that might occur if changes were made to the team.  In evaluating the leadership team, the Court will consider the amount of time counsel has devoted to the litigation and the resources counsel and/or his or her firm have contributed to the litigation, as well as whether any counsel is in arrears in his or her contributions, the ability of counsel to work collaboratively with other members of the leadership team and counsel not appointed to a leadership position and the commitment counsel has shown to the fair, just and efficient management of the case.  The Court

will also periodically assess the needs of the litigation overall, including whether any additional or different resources are necessary for the Plaintiffs' leadership as the case progresses.

The Court declines to appoint an Executive Committee at this time; in lieu of such an appointment, the Court makes the following designations:

Roopal Luhana as the Chair of the ESI/Document Production Committee;

Ashley Keller as the Chair and Frederick Longer as Co-Chair of the Law & Briefing Committee;

Melanie Muhlstock and Carmen Scott as Co-Chairs of the Leadership Development Committee;

Daniel Nigh as the Chair of the Science & Experts Committee;

Mikal Watts as the Chair and Brent Wisner as the Co-Chair of the Bellwether & Trial Team.

The Court leaves designation of other committee co-chairs, subcommittee membership, and creation of any other committees to the full discretion of Lead Counsel, including the timing of such decisions. The Court also directs the Lead Counsel to consider what structure will be most useful with respect to state/federal coordination, and to report on its recommendation at an upcoming status conference.

**B.**     **<u>Defining the Authority, Duties, and Responsibilities of Plaintiffs' Leadership</u>**

The specific duties to be undertaken by Lead Counsel, Liaison Counsel members of the Steering Committee, and Leadership Development Committee are as follows:

      **i.**     **Lead Counsel**

Lead Counsel will be responsible for prosecuting any and all potential common benefit claims and class claims, as well as coordinating the pretrial proceedings conducted by counsel

for the individual Plaintiffs. With respect to the common benefit claims, class claims and coordinated pretrial proceedings, Lead Counsel shall:

(a) determine (after consultation with members of the Steering Committee and other co-counsel as may be appropriate) and present (in briefs, oral argument, or such other fashion as may be appropriate, personally or by a designee) to the Court and opposing parties the position of the Plaintiffs on matters arising during the coordinated pretrial proceedings;

(b) coordinate the initiation and conduct of discovery on behalf of the Plaintiffs consistent with the requirements of Fed. R. Civ. P. 26, including the preparation of joint interrogatories and requests for production of documents and the examination of witnesses in depositions, except that the discovery and motions initiated by the Defendants directed to or regarding named individual Plaintiffs will be handled by the attorney(s) for those individuals;

(c) delegate specific tasks to other counsel in a manner to ensure that pretrial preparation for the Plaintiffs is conducted effectively, efficiently and economically;

(d) enter into stipulations with opposing counsel necessary for the conduct of the MDL;

(e) convene meetings of the Steering Committee or other subcommittees as necessary for the purpose of proposing joint action and discussing and resolving matters of common concern;

(f) organize themselves and agree on a plan for conducting the MDL on behalf of all Plaintiffs;

(g) assess members of the Steering Committee (including Liaison Counsel), Leadership Development Committee, and other counsel performing authorized common benefit

work common benefit payments into a Common Benefit "Shared Cost" Fund, in amounts and at times they determine to be necessary and appropriate in consultation with the Steering Committee, collect payments, maintain an account, pay generic expense, and account to the Steering Committee and the Court upon request as to the collection and use of such funds;

(h) brief and argue motions for the Plaintiffs and file opposing briefs and argue motions and proceedings initiated by other parties (except as to matters specifically directed to individual Plaintiffs and heir counsel) or designate the appropriate counsel to carry out these tasks;

(i) consult with and employ expert witnesses;

(j) maintain time and expense records for work performed, costs incurred and other disbursements made or any potential common benefit claim, proof of potential common benefit claim, and related matters on behalf of the Steering Committee, and report with reasonable regularity, in writing, to the Steering Committee, and Liaison Counsel, concerning expenses, disbursements, and receipts;

(k) monitor work performed by the Steering Committee, Leadership Development Committee, Liaison Counsel, subcommittee members and those whose work it has specifically authorized;

(l) perform all tasks necessary to carry out the functions of Lead Counsel and to properly coordinate Plaintiffs' pretrial activities;

(m) form task-specific subcommittees of counsel, as appropriate;

(n) authorize Plaintiffs' counsel to initiate case-specific motions and discovery;

(o) designate Plaintiffs' counsel authorized to attend hearings and depositions;

(p) conduct settlement negotiations on behalf of Plaintiffs, and enter into settlement agreements subject to Court approval;

(q) if there is a settlement, propose a plan of allocation;

(r) prepare and distribute periodic status reports to the Steering Committee, the Court, and the parties; and

(s) coordinate and communicate with Defendants' counsel with respect to the matters addressed in this paragraph.

No generic discovery or other common action or work in this litigation will be undertaken on behalf of the Steering Committee except at the direction or with permission of Lead Counsel.

### ii. Plaintiffs' Liaison Counsel

Plaintiffs' Liaison Counsel shall maintain up-to-date service lists of all Plaintiffs' attorneys involved in this MDL. Liaison Counsel shall ensure that all Orders entered by this Court and all papers filed by the Defendants are timely distributed to all Plaintiffs' counsel in the MDL and shall facilitate communication between Plaintiffs' counsel and the PSC, as well as other subcommittee members (including LDC) as directed by Lead Counsel. In addition, Liaison Counsel shall work with Lead Counsel in scheduling meetings of the PSC, keeping minutes of these meetings, appearing at Court noticed status conferences, and performing other necessary administrative or logistic functions for the effective and efficient functioning of the MDL, work with Defendants' counsel to create a single electronic document depository that will be used in both this MDL and related state and federal cases and assume any other duties delegated by Lead Counsel.

### iii. Steering Committee

Members of the Steering Committee shall consult with and operate under the direction of Lead Counsel in the prosecution of any and all potential common benefit claims and class claims, as well as coordinating the pretrial proceedings conducted by counsel for the individual Plaintiffs.

### iv. Committee Members

The Chairs and/or Co-Chairs of any subcommittee shall work under and at the direction of Lead Counsel in all aspects of their work in this MDL. Committee members, including those of the Leadership Development Committee, shall work under the direction of the Committee Chair(s) of their committee with respect to all committee work performed in this MDL and at the overall direction of Lead Counsel.

## III. CENSUS REGISTRY

In PTO #15, the Court ordered that the deadline for the first tranche of Census Plus Forms would be 60 days from the date of this Order. The Court hereby extends the deadline for submission of the Census Plus Forms for both filed and unfiled cases by 14 days. This extension shall only apply to those forms for cases filed in the MDL on or before May 22, 2020, or cases for which retention agreements are signed on or before May 22, 2020. Deadlines for cases filed or retained after May 22, 2020 are not extended by this Order.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 8th day of May, 2020.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

17